1 | KEVIN M. YOPP (Bar No. 218204)
kevin.yopp@yopplegal.com
2 | LAW OFFICES OF KEVIN M. YOPP
A Professional Corporation
3 | 401 Wilshire Boulevard
12th Floor Penthouse
4 | Santa Monica, California 90401-1456
Telephone: (310) 496-4353
5 | Facsimile: (310) 496-1955

6 | Attorneys for Plaintiff
Aliya Medcare Finance, LLC
7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 |

11 | ALIYA MEDCARE FINANCE, LLC,
a Nevada limited liability company;
12 |

13 | Plaintiff,

14 | v.

15 | ROBERT P. NICKELL, an individual;
COMPREHENSIVE TOXICOLOGY
16 | BILLING, LLC, a California limited
liability company; EXEC BILLING
17 | SERVICES, LLC, a California limited
liability company; and DOES 1-10,
18 | inclusive;

19 | Defendants.

Case No. CV 14-07806 MMM(SHx)

**PLAINTIFF ALIYA MEDCARE FINANCE, LLC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Hearing Date: May 4, 2015
Time: 10:00 a.m.
Place: Courtroom 780
(Roybal Building)

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................... 1

FACTUAL BACKGROUND......................................................................... 3

ARGUMENT ................................................................................................ 5

I.   ALIYA HAS ADEQUATELY STATED CLAIMS FOR CONVERSION. .... 5

II.  ALIYA HAS ADEQUATELY STATED A TORTIOUS
     INTERFERENCE CLAIM AGAINST NICKELL.......................................11

III. ALIYA HAS ADEQUATELY ALLEGED FRAUD CLAIMS
     AGAINST NICKELL AND CTB.................................................................13

     A.   Nickell Lied About His Doctors Being In-Network
          to Induce Aliya to Enter the Third Agreement. ...................13

     B.   Aliya Has Stated a Claim for Concealment. .........................17

     C.   Aliya Has Stated a Claim for Negligent Misrepresentation. ...............19

     D.   Aliya Has Stated Claims for Promissory Fraud.....................19

IV.  ALIYA HAS PROPERLY ALLEGED AN UNLAWFUL BUSINESS
     PRACTICES CLAIM AGAINST NICKELL.................................................22

V.   ALIYA HAS STATED A CONSTRUCTIVE TRUST CLAIM. ....................23

VI.  ALIYA HAS STATED A CLAIM AGAINST EXEC BILLING. ..................24

CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alam v. Reno Hilton Corp.*, 819 F. Supp. 905 (D. Nev. 1993) ................................. 12

*Avery v. Barsky*, No. 3:12-cv-00652-MMD-WGC,
2014 WL 852493 (D. Nev. Mar. 4, 2014) .................................................................. 24

*Bankers Trust Co. v. Pacific Employers Insurance Co.*,
282 F.2d 106 (9th Cir. 1960) ..................................................................................... 15

*Barmettler v. Reno Air, Inc.*, 956 P.2d 1382 (Nev. 1998) ....................................... 13

*Blanck v. Hager*, 360 F. Supp. 2d. 1137 (D. Nev. 2005) ......................................... 12

*Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588 (Nev. 1992) ....................................... 19

*Coleman v. Romano*, Nos. 58597, 59257,
2014 WL 549489 (Nev. Feb. 10, 2014) ..................................................................... 16

*Haigh v. Matsushita Elec. Corp. of Am.*,
676 F. Supp. 1332 (E.D.Va.1987) ............................................................................. 12

*Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir.1980) ................................. 2, 10

*Hester v. Vision Airlines, Inc.*, No. 2:09-CV-0117-RLH-RJJ,
2011 WL 856871 (D. Nev. Mar. 9, 2011) ................................................................. 10

*Hilton Hotels Corp. v. Butch Lewis Prods.*, Inc., 862 P.2d 1207 (Nev. 1993) ..... 2, 10

*Hirsch v. Phily*, 73 A.2d 173 (N.J. 1950) ..................................................... 7, 8, 18, 23

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ....................................................... 22

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*,
89 P.3d 1009 (Nev. 2004) .......................................................................................... 15

*Laguna Commercial Capital, LLC v. Se. Texas EMS, LLC*,
No. CV 11-09930 MMM (PLAx),
2011 WL 6409222 (C.D. Cal. Dec. 21, 2011) ................................................. 2, 5, 6, 9

*Locken v. Locken*, 650 P.2d 803 (Nev. 1982) ........................................................... 23

*M.C. Multi-Family Dev., L.L.C. v. Crestdale Assocs.*,
193 P.3d 536 (Nev. 2008) ................................................................................... 5, 7, 9

*Medi-Cen Corp. v. Birschbach*, 720 A.2d 966 (Md. Ct. App. 1998) ................. 7, 8, 9

*Pelletier v. Pelletier*, 742 P.2d 1027 (Nev. 1987) .................................................... 9

*Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 1
22 B.R. 871 (S.D.N.Y. 1991) ...................................................................................... 7

*Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38 (2010), .............................10

*PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368 (2000) ................................21

*Receivables Exchange, LLC v. Suncoast Technology, Inc.*, No. 10-4152,
   2012 WL 1019623 (E.D. La. Mar. 26, 2012).........................................5, 7

*Rodriguez v. The Primadonna Co.*, 216 P.3d 793 (Nev. 2009)...............................24

*Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18 (1985).........................................19, 20, 21

**Statutes**

Nev. Rev. Stat. § 104-9318(a) .......................................................8

**Other Authorities**

Rest. (Second) Torts § 242 .........................................................7

-iii-

**INTRODUCTION**

Defendants have dramatically increased the stakes of this litigation, and their liability, since Plaintiff Aliya Medcare Finance, LLC ("Aliya") filed its original Complaint in October 2014.  Before the litigation was filed, Defendant Robert Nickell ignored the obligation to set up a lockbox account and deposit the payments he received from insurance companies on Aliya's receivables into that account. Instead, Nickell deposited the checks into his own accounts, used Aliya's funds to run his other businesses, and replenished them to make payments to Aliya as he saw fit.  Shortly after Aliya commenced litigation, however, Nickell and Defendant Comprehensive Toxicology Billing, LLC ("CTB") began unlawfully withholding every insurance payment they received on Aliya's receivables and using that money to pay their own expenses, which includes funding their defense to this litigation. To this day, even though Aliya already paid CTB millions of dollars for the rights to these payments, Nickell and CTB still refuse to turn-over any of the insurance company payments on Aliya's receivables.  Defendants have now stolen in excess of $1.5 million.

To make matters worse, Nickell and CTB also began aggressively collecting on Aliya's receivables and trying to prevent Aliya from collecting on its own receivables to steal that money as well.  Nickell and CTB locked Aliya out of the practice management software that Aliya uses to collect on the receivables, even though CTB is required to provide such access.  Nickell and the other Defendants also sent notices to insurance companies and Aliya's lien representatives instructing them not to deal with Aliya or make any payments to Aliya.  Nickell and CTB have also entered into settlements with insurance companies regarding the amount that the insurance company will pay to resolve Aliya's receivables.  Nickell and CTB refuse to provide Aliya's mail regarding its receivables, even though they are required to do so.  To the contrary, they have gone so far as to file change of address

1  forms with the United States Post Office so that CTB will receive Aliya's mail.
2  Defendants have indicated that they will continue this conduct until the case is
3  resolved at trial to secure money they claim to be owed.  *See, e.g.*, Nickell Decl.
4  ¶ 22, Nov. 24, 2014 [Dkt. No. 12-1].  As a result, Nickell and CTB have converted
5  the receivables that Aliya purchased.  Aliya filed the First Amended Complaint in
6  December 2014 to address this additional wrongdoing since the filing of the original
7  Complaint in October.
8      Based on the rhetoric throughout Defendants' motion to dismiss, their
9  principal grievance with the First Amended Complaint ("FAC") appears to be that
10 Aliya has brought tort claims against them.  *See, e.g.*, Mot. 1 ("convoluted tort
11 dispute"), 2 ("Aliya's efforts to 'tortify' this action are futile"), 7 ("nothing more
12 than a contract claim masquerading as a tort claim"), 13 ("Aliya may not try to twist
13 a simple contract claim"), 17 ("nothing more than a disguised breach of contract
14 claim").  But nothing prevents Aliya from bringing tort claims against Defendants
15 for their misconduct just because there is a contractual relationship between CTB
16 and Aliya.  Courts, including this one, have repeatedly acknowledged that the same
17 wrongdoing can give rise to both contract and tort claims.  *See, e.g.*, *Laguna*
18 *Commercial Capital, LLC v. Se. Texas EMS, LLC*, No. CV 11-09930 MMM
19 (PLAx), 2011 WL 6409222, at *4-6 (C.D. Cal. Dec. 21, 2011) (granting preliminary
20 injunction because factor was likely to succeed against defendants who deposited
21 factor's receivable checks into their own accounts).  In fact, Nevada law, which
22 governs here, provides that "a wrongful act which is committed during the course of
23 a contractual relationship may give rise to both tort and contractual remedies."  *See*
24 *Hilton Hotels Corp. v. Butch Lewis Prods.*, Inc., 862 P.2d 1207, 1209 (Nev. 1993);
25 *see also Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898-99 (2d Cir.1980) ("[I]it
26 does not follow that because acts constitute a breach of contract they cannot also
27 give rise to liability in tort.").
28

Defendants also make a variety of arguments that require the Court to ignore the well-pleaded factual allegations in the First Amended Complaint to adjudicate potential defenses they intend to raise. For the reasons that follow, these arguments have no merit, and Defendants have not met their burden to show that any of Aliya's claims should be dismissed. Their motion should be denied.

## FACTUAL BACKGROUND

The First Amended Complaint details the factual allegations in this case, including Aliya and CTB's three agreements for the purchase and sale of all of CTB's accounts receivable for toxicology testing of workers' compensation patients. FAC ¶¶ 22-34 & Exs. A-C. The first two agreements involved the purchase of approximately $12 million worth of existing receivables. *Id.* ¶¶ 27-28. The third agreement (the "Third Agreement") involved the purchase of approximately $18 million worth of existing receivables and the right to all of CTB's receivables for five years. *Id.* ¶ 29. All told, Aliya purchased over $83 million worth of receivables from CTB before Aliya ultimately terminated the Third Agreement due to the many breaches by CTB. *Id.* ¶ 34.

Before entering into the Third Agreement, Aliya was increasingly concerned with the referring doctors being in-network (i.e., the doctors prescribing the urinalysis on the patient). Because of workers' compensation legislation having taken effect in January 2013, Aliya believed there would be increased scrutiny by insurance companies of whether a provider was in-network, which in turn would materially affect the collectability of receivables involving an out-of-network provider. *Id.* ¶¶ 35-37. Aliya would not have entered into the Third Agreement absent assurances regarding the doctors' in-network status. *Id.* ¶¶ 121-122.

To induce Aliya to enter into the agreement, Nickell told Aliya's representatives that the referring doctors for the healthcare receivables were in-network with the insurance companies making payments on the receivables. *Id.*

1   ¶ 38.  In fact, Nickell said that he had a screening process in place for the doctors to

2   make absolutely sure.  He told Aliya that those few physicians that CTB did not

3   confirm as members of the applicable networks had submitted an application for

4   membership, and that their acceptance into the network was pending.  *See* Nord

5   Decl. ¶ 18 [Dkt.# 38].  As a further assurance, Nickell promised that, if it turned out

6   that the referring doctor for a receivable was *not* in-network, then Aliya could return

7   that receivable to CTB for a refund.  *See* FAC Ex. C § 14(f) (the Third Agreement).

8        Nickell's assurances that his doctors were in-network were false.  Aliya

9   discovered that the doctors were almost entirely out-of-network.  FAC ¶¶ 42-47.

10   Although Nickell initially tried to deny this, he later admitted the doctors were out-

11   of-network.  *Id.* ¶¶ 48-49.  The parties discussed the issue to try to resolve it but

12   never did.  *Id.* ¶ 49.  When Aliya requested a refund for over $17 million worth of

13   out-of-network receivables, Nickell refused.  *Id.* ¶¶ 50-59.  Aliya has alleged facts

14   supporting that Nickell must have known that the doctors were actually out-of-

15   network when he said they were in-network and never really intended to honor

16   Aliya's right to a refund for out-of-network doctors.  FAC ¶¶ 42-45, 63, 65-66, 120.

17        Around the same time Aliya found out that the doctors were almost entirely

18   out-of-network and approached Nickell about it, he began diverting toxicology

19   business to other companies he owns and operates even though Aliya was supposed

20   to receive all of this business for five years.  *Id.* ¶¶ 78-83.  Nickell diverted a total of

21   $18 million worth of toxicology receivables to his other companies, causing Aliya to

22   lose millions of dollars.  *Id.* ¶ 80.

23        These actions (and others, *see* FAC ¶¶ 67-77) caused Aliya to terminate the

24   Third Agreement on November 5, 2014, which will also result in millions of dollars

25   in lost profits to Aliya based on the remaining years of the five-year deal.  But by

26   far, Nickell's worst, most egregious misconduct has occurred since then.  As

27   discussed above, Nickell and CTB are collecting on Aliya's receivables, using the

28

1  money to pay their own expenses, and keeping the rest – while actively preventing
2  Aliya from collecting on them.

3      Aliya filed its First Amended Complaint on December 18, 2014 to address
4  this additional wrongdoing.  Defendants have not moved to dismiss the breach of
5  contract claims against CTB or the accounting claim but have moved to dismiss
6  everything else.

**ARGUMENT**

7

8  **I.    ALIYA HAS ADEQUATELY STATED CLAIMS FOR CONVERSION.**

9      Aliya has alleged that Nickell and CTB have converted the receivables Aliya
10  purchased from CTB by:  (1) by cashing the checks received from insurance
11  companies as payments on Aliya's receivables and not giving Aliya the money,
12  FAC ¶¶ 98-105, 156-157, (2) by actively collecting on Aliya's receivables (to keep
13  those payments too) and (3) preventing Aliya from collecting on its own
14  receivables.  FAC ¶¶ 106-117, 158.  This conduct falls squarely within the definition
15  of conversion under Nevada law, where conversion liability arises from "a distinct
16  act of dominion wrongfully exerted over another's personal property in denial of, or
17  inconsistent with his title or rights therein or in derogation, exclusion, or defiance of
18  such title or rights."  *M.C. Multi-Family Dev., L.L.C. v. Crestdale Assocs.*, 193 P.3d
19  536, 542 (Nev. 2008) (quotations and citations omitted).

20      Courts, including this one, have found potential conversion liability in the
21  factoring context.  Indeed, in another factoring case with similar facts, this Court
22  found that the plaintiff was likely to succeed on the merits of its conversion claim.
23  *See Laguna Commercial Capital, LLC v. Se. Texas EMS, LLC*, No. CV 11-09930
24  MMM (PLAx), 2011 WL 6409222, at *4-6 (C.D. Cal. Dec. 21, 2011).  Like Nickell
25  and CTB, those defendants were also improperly failing to turn-over to the factor
26  proceeds collected on healthcare receivables that the factor had purchased.  *See id.*
27  at *3-4.  The Court expressly held that the factor was likely to succeed on its

28

5

1   conversion claim and granted a TRO and preliminary injunction requiring

2   defendants to turn-over proceeds collected on the factor's receivables. *Id.* at *1, 5-6.

3   In their motion to dismiss, Defendants do not distinguish the *Laguna* case or explain

4   why they believe the Court erred by finding a likelihood of success on the

5   conversion claim there even though they were well aware of the decision. *See* Dkt.#

6   20 at 6 (citing *Laguna*).

7           Other courts agree that interfering with a factor's right to payments on

8   receivables can constitute conversion. *See, e.g.*, *Receivables Exchange, LLC v.*

9   *Suncoast Technology, Inc.*, No. 10-4152, 2012 WL 1019623, at *8-9 (E.D. La. Mar.

10  26, 2012) (denying summary judgment on conversion claim against company officer

11  who interfered with factor's right to payments); *Pioneer Commercial Funding Corp.*

12  *v. United Airlines, Inc.,* 122 B.R. 871, 884-85 (S.D.N.Y. 1991) (holding that

13  accounts receivable can be the subject of a conversion action because "receivables,

14  while resulting from accounting entries, nevertheless represent tangible, marketable

15  assets which can be sold, secured, or traded"); *Medi-Cen Corp. v. Birschbach*, 720

16  A.2d 966, 969-72 (Md. Ct. App. 1998) (holding that accounts receivable can be

17  converted but remanding on the issue of damages); *Hirsch v. Phily,* 73 A.2d 173,

18  176-77 (N.J. 1950) (holding corporate officers personally liable for withholding

19  funds due to factor on purchased receivables).

20          These decisions reflect the modern view, embodied in the Restatement, that

21  interference with intangible rights can give rise to conversion liability. *See* Rest.

22  (Second) Torts § 242 ("Conversion of Documents and Intangible Rights").  Under

23  the Restatement view, conversion liability attaches when one wrongfully exerts

24  dominion over a document in which intangible rights are merged or when one

25  effectively prevents the exercise of intangible rights, even though the document

26  associated with those rights is not itself converted.  *See* Rest. (Second) Torts § 242.

27  The Nevada Supreme Court has adopted the Restatement view on this point.  *See*

28

1   *M.C. Multi-Family*, 193 P.3d at 543. "In so doing, we note a trend toward

2   recognizing intangible property as personal property that can be converted and

3   expressly reject the rigid limitation that personal property must be tangible in order

4   to be the subject of a conversion claim." *Id.*

5        There is no question that Nickell and CTB committed conversion by

6   depositing checks belonging to Aliya, using some of the proceeds to pay expenses,

7   and withholding the rest. *See Receivables Exchange*, 2012 WL 1019623, at *9

8   ("These facts can support a claim for conversion of those funds, because a fact

9   finder could possibly find that [defendant's] actions denied the buyers the right to

10  payment of the [receivables] which they owned."); Rest. (Second) Torts § 242 cmt.

11  c (conversion of negotiable instruments) & Illus. 1 (theft of check); *Hirsch,* 73 A.2d

12  at 176-77; *see also Medi-Cen*, 720 A.2d 969 ("conversion may involve nothing

13  more than the improper withholding of property from the owner."). Aliya has

14  alleged that, since November 2014, Nickell and CTB are cashing checks received

15  from insurance companies on receivables that Aliya purchased from CTB, using the

16  proceeds to pay their own expenses, and withholding the rest of the money from

17  Aliya. FAC ¶¶ 98-99. Aliya has propounded discovery to determine the exact

18  amount withheld by Nickell and CTB and believe the amount now exceeds $1.5

19  million. Of course, because Defendants continue their unlawful acts, the amount of

20  money converted increases every day, and only Defendants know the exact amount.

21        Far from denying this wrongdoing, Defendants readily admit to using

22  payments on Aliya's receivables to pay their own expenses and withholding the rest.

23  *Id.* ¶ 100; *accord* Joint Report of the Parties Pursuant to Rule 26(f) 8:15-22 (CTB

24  admits that it is "holding all monies it collects on receivables that Plaintiff

25  purchased prior to November 5, 2014 (net of expenses) until resolution of this

26  lawsuit.") [Dkt.# 54]; Counterclaim ¶¶ 24-26 ("CTB has been collecting receivables

27  existing as of November 5, 2014 and placing the proceeds thereof (minus CTB's

28

costs) into a separate bank account for the pendency of the lawsuit.") [Dkt.# 79].  Of course Nickell and CTB have no right to withhold proceeds on receivables that unquestionably belong to Aliya, much less use Aliya's funds at their discretion. CTB assigned all right, title, and interest to the receivables and any proceeds thereon to Aliya.  FAC ¶ 101 (citing assignment provisions in each of the parties' three purchase agreements, FAC Exs. A-C).  Even if those assignment provisions did not exist in the parties' agreements, Nevada law provides that CTB maintains no right, title, or interest to any receivable that it sold Aliya.  *See* Nev. Rev. Stat. § 104-9318(a) ("A debtor that has sold an account, chattel paper, payment intangible or promissory note does not retain a legal or equitable interest in the collateral sold.").[1] As a result, Nickell and CTB's conduct vis-à-vis the receivable payments constitutes conversion.[2]

Nickell and CTB have also converted Aliya's receivables by collecting on them while preventing Aliya's efforts to do so.  Like the defendant in *Medi-Cen*, Nickell and CTB have "commandeered" Aliya's accounts receivable as their own. 720 A.2d at 968.  Aliya alleges that also beginning in November 2014, Nickell and CTB locked Aliya staff out of the practice management software containing the receivable data used to collect, FAC ¶¶ 106-110, refused to provide copies of mail related to Aliya's receivables (which is necessary to collect and is Aliya's property

---

[1] Additionally, CTB and Nickell cannot escape liability by claiming they believed they had a right to withhold the payments on Aliya's receivables because conversion is a strict-liability tort.  *See M.C. Multi-Family*, 193 P.3d at 542-43 ("conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge.") (quotations and citation omitted).

[2] Defendants rely on *Pelletier v. Pelletier*, 742 P.2d 1027, 1028 (Nev. 1987).  Mot. 17:4-5.  That case found conversion liability for taking coins, cashing them in, and spending the proceeds.  There is little difference between that conduct and Defendants' conduct here, either in terms of the actual conduct or its moral reprehensibility.

under each of the agreements), *id.* ¶¶ 110-111 & Ex. C § 4, and instructed insurance companies not to deal with Aliya on the receivables, FAC ¶ 112, all while engaging in *their own* collection activities on Aliya's receivables in violation of Aliya's rights.  FAC ¶¶ 112-116; *accord* Counterclaim ¶¶ 24-26.[3]  Nickell and CTB's collecting on Aliya's receivables, spending the proceeds, and withholding what it doesn't spend also eviscerates Aliya's irrevocable right to sell, transfer, or assign the receivables to any person.  *See* FAC Ex. C § 11.  No buyer would purchase these receivables while Nickell and CTB continue with their illegal acts.  FAC ¶ 116.

Defendants make little effort to justify their misconduct.  Defendants have no cited any factoring cases, much less any cases immunizing them from keeping Aliya's checks and collecting on Aliya's receivables.  Instead, they argue that Aliya's conversion claim is really "a disguised breach of contract claim." Mot. 17.  Defendants, however, have not presented any case holding that conversion cannot arise in a contractual setting.  It can.  All the factoring cases discussed above involve contracts and support that a plaintiff may maintain both tort and contract claims arising out of the same wrongful conduct, including the *Laguna* case decided by this Court.  2011 WL 6409222, at *5.  In fact, the Nevada Supreme Court has expressly recognized that "a wrongful act which is committed during the course of a contractual relationship may give rise to both tort and contractual remedies."  *See Hilton Hotels Corp. v. Butch Lewis Prods.*, Inc., 862 P.2d 1207, 1209 (Nev. 1993);

---

[3] Defendants argue that it tried to "retain a mutually agreed-upon third party to collect receivables and maintain the proceeds thereof…to preserve the status quo during the pendency of the lawsuit."  Mot. 5 n.3.  That, however, does not justify stealing Aliya's money.  Aliya indisputably owns all the receivables and all the proceeds thereof.  Defendants have never contended otherwise.  The only "status quo" to "preserve" would be to allow Aliya to continue collecting on its receivables and receiving its proceeds.  Neither Defendants nor any "third party" has any right to interfere with Aliya's ownership rights.  Further, the only "third party" that Defendants demanded was Benjamin Shisler, Nickell's relative and employee who was clearly under the control of and acting in the interests of Defendants.

1    *see also Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898-99 (2d Cir.1980) ("[I]it

2    does not follow that because acts constitute a breach of contract they cannot also

3    give rise to liability in tort.").  Even if that were not the rule, Aliya has no contract

4    with Nickell and has alleged conversion against him for authorizing, directing, and

5    participating in the conversion.  FAC ¶¶ 105, 117.

6           Defendants quote one sentence in one case, *Plummer v. Day/Eisenberg, LLP*,

7    184 Cal. App. 4th 38, 45 (2010), to make their argument:  "[A] mere contractual

8    right of payment, without more, will not suffice."  Mot. 17:17-19.  Putting aside that

9    the *Plummer* court actually reversed  the trial court because it found triable issues on

10   the conversion claim, 184 Cal. App. 4th 45-48, Aliya *has* alleged much more than a

11   mere contractual duty to pay.  The issue in *Plummer* was whether the attorney was

12   contractually entitled to an attorneys' lien on the settlement funds, which would

13   entitle him to possession of them and thereby give rise to conversion liability.  *Id.*

14   Aliya has alleged its right to possession of the property – the right to collect on its

15   own receivables and receive all payments thereon.  FAC ¶¶ 101-105, 113-116.[4]

16   Those allegations, coupled with Defendants' interference with that right, are

17   sufficient to establish conversion liability.

18          Next, Defendants argue that Aliya has not identified the converted money

19   with sufficient particularity.  Mot. 17-18.  Defendants are essentially arguing that

20   they cannot be held liable for stealing because Aliya did not allege exactly how

21   much money they stole.  Yet the case Defendants cite to make this argument

22   actually confirms that Aliya has sufficiently pled this claim.  *See id.* (citing *Hester v.*

23   *Vision Airlines, Inc.*, No. 2:09-CV-0117-RLH-RJJ, 2011 WL 856871 (D. Nev. Mar.

24   9, 2011)).  In *Hester*, the district court held that:

25

26   _____

27   [4] The district judge in *Receivables Exchange* rejected as "severely exaggerate[d]"
     the same argument that "an action for conversion of funds may not be maintained to

28   satisfy a mere obligation to pay money."  2012 WL 1019623, at *8.

1
2
3
4
5

> Where the money, or the specific amount of money, is identifiable, such as where it is earmarked, or set aside in a separate account, or otherwise identifiable, any presumption that the one in possession of money has title to it is overcome. Where, as here, Vision received money specifically earmarked to be given to its flight crews, but kept it for its own benefit, it has converted the property (money), to which it has little or no right. Under Nevada law, money can be the subject of a conversion claim.

6    2011 WL 856871, at *2-3 (citations omitted). There is no question that payments

7    from insurance companies on receivables that Aliya has purchased from CTB is

8    "identifiable" and "earmarked" for Aliya.  But Defendants are withholding those

9    specific, identifiable funds for their own benefit.  Indeed, Defendants do not claim

10   (nor could they plausibly do so) that they received money but they are not sure

11   whether it belongs to CTB or Aliya. That is because such funds are easily

12   identifiable, and all title and right to those specific funds belongs to Aliya. So *Hester*

13   confirms that such conduct can give rise to conversion liability under Nevada law.

14   Wrongfully asserting a possessory interest, like Defendants have done here, is

15   textbook conversion.

16   **II.    ALIYA HAS ADEQUATELY STATED A TORTIOUS**
     **INTERFERENCE CLAIM AGAINST NICKELL.**
17

18           The FAC states a claim against Nickell for intentional interference with

19   contractual relations.  Nickell does not dispute that Aliya has pled all the elements

20   of the claim.  Instead, Nickell contends that, because he is the president of CTB, he

21   is CTB's agent and therefore cannot be held liable for intentional interference with

22   CTB's contracts.  Mot. 19:19-22.  Nickell is incorrect.  The relevant inquiry is not

23   the title he holds but the capacity in which he was acting when he committed the

24   wrongdoing.  Because he was acting on behalf of another entity of his (and not in

25   CTB's interest) when he diverted toxicology business that should have been billed

26   out by CTB, Nickell can be held liable for tortious interference.

27

28

1  Generally a party cannot tortiously interfere with its own contract.  Mot. 19:

2  7-9) (citing *Blanck v. Hager*, 360 F. Supp. 2d. 1137, 1154 (D. Nev. 2005)).

3  Although Nevada courts have not addressed the issue, it follows from this general

4  rule that "agents acting *within the scope of their employment, i.e., the principal's*

5  *interest* do not constitute intervening third parties, and therefore cannot tortiously

6  interfere with a contract to which the principal is a party."  *Blanck*, 360 F. Supp. 2d

7  at 1154 (emphasis added); *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911-12 (D.

8  Nev. 1993) (citing *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1349

9  (E.D.Va.1987)).  But, as the *Haigh* court acknowledges, an agent can be held liable

10  in a situation where he does *not* act within the scope of his employment – i.e., if he

11  does *not* act in the interests of the principal.  *Haigh*, 676 F. Supp. at 1349.  That is

12  precisely the case here:  Nickell was acting directly contrary to CTB's interests

13  when he was diverting business from CTB to other entities that he owns or

14  controls.[5]

15  Under the Third Agreement, Aliya purchased the rights to all of CTB's

16  receivables for five years.  FAC ¶¶ 26, 29 & Ex. C, at §§ 3-4.  Just seven months in

17  the five-year agreement, however, Nickell began secretly billing approximately $18

18  million worth of toxicology business through other entities he owns and controls

19  when he should have billed that toxicology business out through CTB.  *Id.* ¶¶ 78-80.

20  As a result, the volume of receivables that CTB billed to insurance companies and

21  sold to Aliya dropped dramatically (from an average of $5.2 million per month to

22  less than a million), and Aliya lost millions of dollars' worth of profits.  *Id.* ¶¶ 81,

23  86.  Because the volume of receivables that CTB billed to insurance companies and

24  sold to Aliya dropped dramatically, so did CTB's revenue from Aliya's purchase of

25  receivables.  Thus, by diverting receivables to his other businesses, Nickell was not

26

27  _____

28  [5] Aliya has discovered that one such Nickell entity is Chematox Biosciences, LLC.
The Court has granted Aliya leave to add this entity as Defendant Doe 1.  Dkt.# 76.

acting in the interests of CTB – he was acting in his own interest or in the interest of those other companies.  Indeed, Aliya specifically alleges that "[a]t all relevant times, when Nickell was diverting business from CTB to the Doe Defendants, he was acting outside the course and scope of any capacity he had with CTB.  Instead, Nickell was acting on behalf of the Doe Defendants when he diverted CTB business to them." *Id.* ¶ 167.  Accepting these allegations as true, which the Court must at this stage, brings the case squarely within the rule providing that Nickell can be held liable for interfering with Aliya and CTB's contract.

## III.  ALIYA HAS ADEQUATELY ALLEGED FRAUD CLAIMS AGAINST NICKELL AND CTB.

### A.  Nickell Lied About His Doctors Being In-Network to Induce Aliya to Enter the Third Agreement.

Aliya has adequately alleged a claim for fraudulent inducement based on Nickell's false representation that his doctors were in-network.[6]  Although the fact that Nickell knew that his doctors were out-of-network may be alleged generally, *see* Fed. R. Civ. Proc. 9(b), Aliya pleads sufficient facts to demonstrate plausibility.

These facts include the large numbers of out-of-network denials that CTB almost certainly received before Nickell made the representation.  *Id.* ¶¶ 44-45, 63, 120.  Initially, CTB serviced the receivables while Aliya prepared to do so by forming a servicing company and hiring staff.  *Id.* ¶ 42.  Soon after Aliya commenced servicing its receivables, it noticed that insurance companies had denied payment on a large number of receivables because the referring physician was out-of-network.  Aliya discovered thousands of receivables, worth millions of dollars in

---

[6] To state a claim for fraudulent inducement under Nevada law, a plaintiff must allege (1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant had an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.  Mot. 7 (citing *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998)).

face value, where the referring doctors were *not* in-network. *Id.* ¶¶ 44. Given the volume of these denials that Aliya immediately discovered upon taking over servicing, there is no way that CTB did not similarly receive a tremendous number of out-of-network denials as well before making the representation. *Id.* ¶ 63. Even if Nickell did not personally see these denials, given the volume and magnitude of the denials, it is extremely unlikely that the issue would not have been brought to his attention. *Id.* ¶ 120.

Aliya also alleges that given Nickell's experience in the workers' compensation business, he generally knew whether the doctors were in-network or not, especially since he also had a business relationship with them (and a personal relationship with some of the doctors). *Id.*[7] They referred him millions of dollars' worth of business. It is implausible that he would *not* know that almost all his doctors were out-of-network.

Aliya also adequately alleges the remaining elements. Nickell made the representation to induce Aliya to enter the Third Agreement, and Aliya alleges that it would not have done so had it known the truth. *Id.* ¶¶ 121-122. In fact, around the same timeframe, Aliya had stopped buying receivables from a provider whose referring physicians were out-of-network. *Id.* Assuming these allegations to be true for purposes of the motion to dismiss, Aliya has pled sufficient facts to state a plausible claim against Nickell and CTB for fraud in the inducement.

Nickell and CTB make a number of arguments that the fraud in the inducement claim cannot stand; none has any merit. First, they argue that "Aliya's fraudulent inducement claim is nothing more than a contract claim masquerading as a tort claim." Mot. 7:12-13. They do not cite any Nevada law to support this point. They did not because under Nevada law (and Ninth Circuit law), a plaintiff like

---

[7] Even if Nickell did not know, he falsely and recklessly represented to Aliya without having made any inquiry or investigation into this fact. *Id.* ¶ 64. That, too, constitutes fraud.

Aliya can pursue both fraud in the inducement and breach of contract claims. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1017 (Nev. 2004). In *J.A. Jones*, the Nevada Supreme Court held that the trial court erred by forcing plaintiff to elect its remedy (fraud or breach of contract) during the trial. *See id.* The Nevada Supreme Court followed the Ninth Circuit's lead on this point:

> As the Ninth Circuit Court of Appeals has recognized, causes of action for fraud in the inducement and breach of contract may be pursued as distinct claims with separate and consistent remedies.

The Court quoted the Ninth Circuit:

> It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract.... The courts of many states have recognized the rule that a suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies.

*Id.* (citing *Bankers Trust Co. v. Pacific Employers Insurance Co.*, 282 F.2d 106, 110 (9th Cir. 1960)). Thus, both the Nevada Supreme Court and the Ninth Circuit have expressly authorized plaintiffs to pursue fraud and breach of contract remedies based on the same wrongdoing.

Nickell and CTB next invite the Court to conclude, on a motion to dismiss, that Aliya has suffered no damages as a result of their fraud. Mot. 8:5-28. Aliya has properly alleged causation and damages, however. As discussed above, Aliya alleges that it would not have entered into the Third Agreement had it known the truth about the receivables. FAC ¶ 122. In fact, around the same timeframe, Aliya stopped buying receivables from a provider whose doctors were out-of-network. *Id.* Because the collection rate is lower for out-of-network receivables than it is for in-network receivables, *see* FAC ¶¶ 36-37, Aliya suffered damages by receiving out-of-network receivables when Nickell promised them *in*-network receivables.

1  Nickell and CTB next argue that, as a matter of law, Aliya did not rely on

2 Nickell's promise that his doctors were in-network because, under the Third

3 Agreement, Aliya has the right to a refund for out-of-network receivables.  Mot. 9,

4 11:3-13.  That argument is disingenuous considering that they will not honor this

5 refund right.  FAC ¶¶ 46-59.[8]  In any event, the fact that Nickell promised a refund

6 in case a receivable or *some* receivables eventually turned out to be out-of-network

7 during the five-year relationship does not mean that Aliya did not rely on his

8 representation that *all* the doctors referring the toxicology business were in-network

9 at the time.  The opposite is true.  Nickell's guarantee of a refund gave Aliya even

10 more reason to believe Nickell when he said his doctors were in-network and rely on

11 those representations.  Either way, Aliya has properly alleged reliance on Nickell's

12 statements that his doctors were in-network.  The truth of that allegation is not

13 suitable for resolution by the Court on a motion to dismiss; it will be for the jury to

14 decide at trial.

15  Finally, Nickell and CTB argue that fraud cannot be predicated on future

16 events.  The case they cite does not stand for that proposition.  *See* Mot. 10 (citing

17 *Coleman v. Romano*, Nos. 58597, 59257, 2014 WL 549489, at *4 (Nev. Feb. 10,

18 2014)).  Even assuming that Nickell and CTB are correct about the rule, however,

19 Aliya's fraud claim survives because it is not based on future events.  Nickell's

20 representation was about a presently existing fact, that his doctors were in-network.

21 Either they were or they were not at the time Nickell made the representation.  Aliya

22 has alleged that they were not.  FAC ¶ 120.  And it was at that point that Aliya relied

23 on Nickell's statement by entering into the Third Agreement.  *Id.* ¶ 122.

24

25 [8] In fact, they argue (incorrectly) that the parties agreed to modify the Third

26 Agreement to remove the refund right.  Mot. 9 n.5.  The parties never agreed to

27 remove Aliya's right to a refund for out-of-network receivables from the Third
Agreement.  *See generally* Mem. P.'s & A.'s in Supp. of Mot. for Rev. § I, Mar. 2,

28 2015 [Dkt.# 60].

At the closing of the Third Agreement, Aliya purchased $18 million worth of existing receivables, more than under the First and Second Agreements combined. *Compare* FAC ¶ 29 *with id.* ¶¶ 27-28.  Thus, Nickell was making a representation about presently existing facts.  Moreover, even for future receivables that Aliya purchased under the Third Agreement, the fact that the particular patients receiving the toxicology services varied does not change whether the doctors who referred that business to Nickell were in-network when he said they were.  The doctors and the insurance companies were constants.  *See* FAC ¶ 47 (alleging that according to Aliya's research of the 26 doctors that collectively referred the vast majority of the business only four had in-network status with at least one of the 44 insurance companies who were the most common payors on the receivables).  The rule regarding future events would only apply, if at all, to the extent that Nickell can prove that new, out-of-network doctors started referring Nickell business after the parties' entered into the Third Agreement or if doctors that were in-network at the time became out-of-network.  These, however, are factual issues that will be borne out during discovery and resolved at trial, not on a motion to dismiss.

### B.   Aliya Has Stated a Claim for Concealment.

Aliya has also properly alleged facts sufficient to give rise to a concealment claim.  Aliya has alleged that Nickell and CTB failed to disclose that (1) the doctors providing toxicology services were out-of-network; (2) they received payment for over $229,000 in receivables that they sold Aliya; and (3) Nickell was diverting toxicology receivables from CTB to other entities he owned.  FAC ¶¶ 126-128.

Nickell and CTB make two arguments why they allegedly cannot be held liable for concealment.  First, they claim that Aliya has not alleged a duty to disclose and does not "even mention the word 'duty.'"  Mot. 12:11-16.  Curiously, they acknowledge that "[a] duty to disclose may arise when 'the defendant along has knowledge of material facts which are not accessible to the plaintiff,'" but then

1    completely ignore that Aliya has made that precise allegation.  *See* FAC ¶ 129

2    ("These were material facts known only to Nickell and CTB, that Aliya could not

3    have discovered on its own.").  Certainly, Aliya had no way of knowing that Nickell

4    and CTB received $229,000 that they did not tell Aliya about.  Just as Aliya had no

5    way of knowing that Nickell was billing out toxicology receivables using other

6    companies he owns and controls when he should have been using CTB.  Likewise,

7    Aliya had no way of knowing that CTB had received a tremendous amount of

8    denials because the receivables were out-of-network when CTB was servicing the

9    receivables.  These facts were only known to Nickell and CTB.

10        Moreover, Aliya has alleged a relationship of trust.  FAC ¶ 190.  A jury could

11   find that relationship exists because CTB received Aliya's checks that insurance

12   companies sent as payment on Aliya's receivables (and was supposed to deposit

13   them in a lockbox account).  *See Hirsch*, 73 A.2d at 176 (when defendant failed to

14   turn-over payments on receivables it became constructive trustee for plaintiff).  In

15   addition, Aliya was originally relying on CTB to service the receivables and provide

16   documentation.  FAC ¶ 42.  In addition, Aliya relied on CTB to provide

17   documentation about the receivables (namely, the out-of-network denials) while it

18   serviced the receivables.  *Id.* ¶ 45.  Aliya discovered a large number of out-of-

19   network denials as soon as it started servicing its own receivables.  *Id.* ¶¶ 44-46.

20   CTB had not been providing the denials.

21        Next, Nickell and CTB make the same argument that, because the Third

22   Agreement provides that Aliya can seek a refund for out-of-network receivables,

23   there can be no reliance.  This argument should be rejected here too.  In the same

24   vein, Nickell argues that his concealment of diverting millions dollars does not give

25   rise to liability because Defendant Exec Billing entered into a non-compete and an

26   indemnity.  But Exec Billing has also moved to dismiss, arguing that it cannot be

27   held liable.  According to Nickell's logic this means the parties contemplated the

28

1  possibility that he would steal so there can be no concealment of that fact.  Whether

2  these facts were "within the fair and reasonable reach" of Aliya will be for the jury

3  to decide.

4        **C.**    **Aliya Has Stated a Claim for Negligent Misrepresentation.**

5        Defendants make the same arguments to dismiss the negligent

6  misrepresentation claim that they make above for the other fraud claims.  These

7  arguments should be rejected for the same reasons discussed above.

8        **D.**    **Aliya Has Stated Claims for Promissory Fraud.**

9

10        Aliya has alleged that Nickell and CTB have committed promissory fraud by

11  making promises to Aliya that they never intended to honor.  Specifically, Nickell

12  and CTB promised (1) that Aliya could return out-of-network receivables for a

13  refund, FAC ¶¶ 66, 136, and (2) that they would set up a lockbox account in which

14  they would deposit all checks that they received from insurance companies as

15  payment on Aliya's receivables.  *Id.* ¶¶ 91-92.  Nickell and CTB did not perform

16  either of these promises and never had any intention to perform them.  That

17  constitutes promissory fraud.  *See Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592

18  (Nev. 1992) (promissory fraud claim requires "evidence that the promisor had no

19  intention to perform at the time the promise was made").

20        Nickell and CTB move to dismiss these claims, arguing that "something

21  more" than just nonperformance is required to prove that the defendant did not

22  intend to perform.  Mot. 16 (citing *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30

23  (1985)).  But Aliya *has* alleged the requisite "something more" here for each of its

24  promissory fraud claims.  As the *Tenzer* court itself acknowledges, "fraudulent

25  intent must often be established by circumstantial evidence."  39 Cal. 3d at 30.

26  "[F]raudulent intent has been inferred from such circumstances as defendant's

27  insolvency, his hasty repudiation of the promise, his failure even to attempt

28

1 | performance, or his continued assurances after it was clear he would not perform."
2 | *Id.* (citing Dean Prosser).

3 | In the case of Aliya's promissory fraud claim based on the promise (and
4 | subsequent failure) to refund payments for out-of-network receivables, the
5 | "something more" is the fact that Nickell knew that the vast majority of doctors
6 | were out-of-network when entering into the Third Agreement and promising a
7 | refund. FAC ¶¶ 44-45, 63, 120. This allegation, which must be accepted as true
8 | here, is more than sufficient to permit the jury to infer that Nickell and CTB never
9 | intended to honor the refund right. For example, consider a situation where one
10 | sells a car knowing that it has a bad engine, while telling the buyer that the engine
11 | runs great. The seller promises that, just in case, he or she will refund the buyer's
12 | money if the car has a bad engine. The buyer discovers that the engine is bad and
13 | requests a refund. Seller refuses. Given the seller's knowledge of the bad engine, it
14 | is virtually certain that the seller never had any intention to ever give a refund in the
15 | first place. The situation is no different here. In fact, it is hard to imagine a fact
16 | more probative of fraudulent intent than this.

17 | In addition, the flimsy excuse Nickell gave when Aliya requested a refund for
18 | out-of-network receivables is tantamount to a "failure even to attempt performance."
19 | CTB and Nickell refused Aliya's refund without identifying so much as a single
20 | doctor that was actually in-network. FAC ¶ 55. It appears that Nickell made the bet
21 | that, even though the receivables were out-of-network, the collectability would be
22 | sufficiently high and sufficiently profitable to Aliya such that it would never request
23 | a refund for the receivables. Nickell was wrong. And when Aliya requested a
24 | refund, not only did Nickell and CTB refuse, but the justification was so flimsy that
25 | the jury could infer that there was never any intention to perform to begin with.
26 | These allegations are more than ample to demonstrate promissory fraud at this stage.
27 |
28 |

Aliya's other promissory fraud claim is based on Nickell and CTB's promise to set up a lockbox account to deposit payments. Aliya raised the issue with Nickell on multiple occasions, repeatedly requested that the account be set up, and sent Nickell the necessary bank forms for execution so the account could be established. FAC ¶ 92. Aliya has alleged that Nickell never intended to set up the lockbox. *Id.* ¶ 138. The "something more" here is Nickel's complete failure to even attempt performance, *see Tenzer*, 39 Cal. 3d at 30, bolstered by the fact that Nickell used the payments on Aliya's receivables, which he should have deposited in the lockbox, to fund other investments of his. *Id.* ¶ 95. Just one example of this is that Nickell used Aliya's funds and then replenished them with a refinancing transaction on his Kashiwa Court property. *Id.* ¶ 95. A jury could infer from these facts that this was Nickell's intent all along, to use and replenish Aliya's funds rather than deposit them in the lockbox as promised. Aliya also believes that Nickell was likely claiming the insurance company payments on Aliya's receivables as revenue, and depositing them in an account monitored by the lender, to meet debt covenants on his commercial property, which would further prove that he never had any intention of establishing the lockbox. Thus, Aliya has properly alleged this promissory fraud claim as well.

Next, Nickell argues that he cannot be held personally liable because he made the promises on behalf of CTB. Mot. 16:16-22. Nickell does not cite any case supporting his argument. Indeed, the law is the opposite. Nickell made the promise without any intention that CTB would perform it. And it is well-settled that corporate officers can be held personally liable for a tort to the extent they authorized it, participated in it, or directed it. *See PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1379-80 (2000). Because Nickell directly participated, he can be held liable for promissory fraud.

## IV.   ALIYA HAS PROPERLY ALLEGED AN UNLAWFUL BUSINESS PRACTICES CLAIM AGAINST NICKELL.

Aliya has brought an unlawful business practices claim under Section 17200 of the California Business and Professions Code against Nickell because cashing Aliya's checks, using the proceeds to pay his expenses, and keeping the rest of Aliya's money are unlawful – they constitute criminal grand theft and embezzlement under California law.  FAC ¶¶ 178-184.   Nickell argues that he cannot be held liable under Section 17200 because the agreements between Aliya and CTB contain a Nevada choice-of-law provision.  Mot. 21:8-23.  Nickell, however, is not a party to those agreements.  The cases Nickell cites in the motion to dismiss do not address the issue presented here, which is whether or not a company's agent receives the benefit of the company's choice-of-law provision.  All of the cases simply provide that, where the parties have selected another forum's law, the *parties* cannot bring a 17200 claim under California law.

In addition, Nickell does not meet his burden to demonstrate that the parties' choice-of-law provision covers non-parties.  The choice-of-law provision states: "All questions concerning the performance, construction, validity and interpretation of this Agreement shall be governed by the laws of the State of Nevada."  *See, e.g.*, FAC Ex. C § 33.  Given the broad remedial purposes behind Section 17200, *see In re Tobacco II Cases*, 46 Cal. 4th 298, 317, 207 (2009), Aliya should be permitted to proceed with the claim.

In fact, Nickell appears to have abandoned this argument because, in the Counterclaim and Third-Party Complaint CTB filed, it brought Section 17200 claims and California statutory trademark claims against a party, Aliya, *and* non-party agents of Aliya like Erik Nord.  *See* Dkt. Nos. 79-80.  Nickell cannot claim on

1  the one hand that only Nevada law applies while at the same time asserting

2  California statutory claims against Aliya and its agents.[9]

3      Nickell also argues that "Aliya must show that Defendants received and

4  unjustly retained a benefit at Aliya's expense." Mot. 21:27-28. Nickell is unjustly

5  retaining a benefit at Aliya's expense, namely the checks he receives from insurance

6  companies  as payment on Aliya's receivables. *See* FAC ¶¶ 178-184.

7  **V.    ALIYA HAS STATED A CONSTRUCTIVE TRUST CLAIM.**

8

9      Aliya has properly alleged a claim for constructive trust. A constructive trust

10  is proper where: "(1) a confidential relationship exists between the parties; (2)

11  retention of legal title by the holder thereof against another would be inequitable;

12  and (3) the existence of such a trust is essential to the effectuation of justice."

13  *Locken v. Locken*, 650 P.2d 803, 805 (Nev. 1982). Aliya alleges a relationship of

14  trust, ownership of the insurance companies' payments on Aliya's receivables, and

15  that Defendants' retention of these payments would constitute unjust enrichment.

16  FAC ¶¶ 189-191.

17      Nevertheless, Defendants move to dismiss claiming that a constructive trust is

18  a remedy, not a stand-alone claim. Mot. 20:10-14 (citing *Locken*). But *Locken* does

19  not say that a constructive trust is only a remedy. To the contrary, it actually

20  confirms that Aliya's constructive trust claim is proper. There, the Nevada Supreme

21  Court affirmed the trial court's imposition of a constructive trust over land that a son

---

22  [9] Defendants have brought their own tort and statutory claims against Aliya and its

23  agents based on Aliya's efforts to collect on its receivables after Nickell and CTB

24  began withholding all the payments. But each of the parties' three agreements

25  irrevocably appoints Aliya as CTB's attorney-in-fact to take all collection efforts in

26  CTB's name that Aliya deems necessary or desirable until all amounts owed to

27  Aliya are paid in full. *See* FAC Ex. A § 17, Ex. B § 21, Ex. C § 24. The parties

28  expressly agreed that Aliya would act in the name of CTB for all purposes to collect

on the receivables. By comparison, each of the three agreements specifically states

that "[CTB] shall have no authority to manage or control any of the Receivables."

*Id.*

1  was supposed to convey to his father and an order requiring the conveyance. 650

2  P.2d at 804-05. No claim other than constructive trust was ever discussed. Similar

3  relief is warranted here to require Defendants to provide the insurance company

4  payments Aliya owns to Aliya.

5      Defendants also argue that Aliya has not alleged a confidential relationship.

6  Not only is that untrue, *see* FAC ¶ 190, but based on the fact that CTB continuously

7  receives payments from insurance companies on Aliya's receivables, a jury could

8  easily find a relationship of trust. *See Hirsch*, 73 A.2d at 176 (when defendant

9  failed to turn-over payments on receivables it became constructive trustee for

10 plaintiff). The cases Defendants cite on this point are easily distinguishable because

11 those relationships did not involve the continuous receipt of property belonging to

12 the other party, an obligation to provide that property to the other party, and a

13 breach of that obligation. Thus, Aliya's constructive trust claim is entirely proper.

14 **VI.   ALIYA HAS STATED A CLAIM AGAINST EXEC BILLING.**

15
16      Aliya has brought a breach of contract claim against Exec Billing to

   indemnify it for CTB's breaches. Exec Billing argues that Aliya must win its breach
17
   of contract claim against CTB *at trial* before asserting its breach of contract claim
18
   against Exec Billing. Mot. 22:22-23:19. That is not the law. None of the cases
19
   Exec Billing cites requires Aliya to separately litigate against Exec Billing after
20
   winning against CTB. All of Exec Billing's cases involve *equitable* indemnity
21
   claims by a defendant against an indemnitor based on a third party's claim against
22
   the defendant. Payment of a judgment or settlement is an element of an *equitable*
23
   indemnity claim. *See, e.g., Rodriguez v. The Primadonna Co.*, 216 P.3d 793,
24
   801(Nev. 2009). But not a contractual indemnity claim like the one here (which is
25
   actually more of a guaranty claim). Indeed, under Nevada law, express indemnity
26
   claims may proceed even when equitable indemnity claims are not ripe. *See Avery*
27
   *v. Barsky*, No. 3:12-cv-00652-MMD-WGC, 2014 WL 852493, at * 5 (D. Nev. Mar.
28

4, 2014) (granting motion to dismiss equitable indemnity claim on ripeness grounds while, at the same time, denying motion on express indemnity claim).  That difference is dispositive, and Aliya has properly stated a claim against Exec Billing.

In addition, it would be inefficient to force Aliya to litigate separately later against Exec Billing, another Nickell entity, since that same principals and counsel would be involved in the subsequent litigation.  Joining Exec Billing as a party to this litigation is not only permissible, but represents a much more efficient resolution of the parties' dispute.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied. To the extent that the Court finds any claim to be deficient, Aliya should be afforded an opportunity to amend to cure the defect since this is the first time that the Court will address the sufficiency of Aliya's allegations.


DATED:  April 13, 2015                    Respectfully submitted,

                                          LAW OFFICES OF KEVIN M. YOPP
                                          A Professional Corporation



                                          By: _____/s/ Kevin M. Yopp_____
                                                Kevin M. Yopp
                                                Attorneys for  Plaintiff
                                                Aliya Medcare Finance, LLC