UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALIYA MEDCARE FINANCE, LLC

    Plaintiff,

    vs.

ROBERT P. NICKELL, an individual;
COMPREHENSIVE TOXICOLOGY
BILLING, LLC, a California limited liability
company; EXEC BILLING SERVICES,
LLC, a California limited liability company;
and DOES 1-10, inclusive,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 14-07806 MMM (Ex)

ORDER GRANTING IN PART AND
DENYING IN PART COUNTER/THIRD
PARTY DEFENDANTS' MOTION TO
DISMISS COUNTERCLAIM AND THIRD
PARTY COMPLAINT

      On October 8, 2014, Aliya Medcare Finance, LLC ("Aliya") filed this action against Robert P. Nickell, Comprehensive Toxicology Billing, LLC ("CTB"), Exec Billing Services, LLC ("Exec Billing") (collectively, "defendants"), and various fictitious defendants.[1] On March 26, 2015, CTB filed a counterclaim against Aliya and a separate third-party complaint against Erik Nord, Henrik Sten, Comprehensive Toxicology Services, Inc. ("CTS"), Upton Park Financial, LLC ("Upton Park"), Allan Alvarado (d/b/a AIM Liens), and Zarafeen Samani (d/b/a Samani Lien Services) (collectively, the "third party defendants").[2]

---

[1]Complaint, Docket No. 1 (Oct. 8, 2014).

[2]Corrected Counterclaim by CTB ("Counterclaim"), Docket No. 80 (Mar. 26, 2015); Corrected Third Party Complaint by CTB ("TPC"), Docket No. 80 (Mar. 26, 2015). Aliya

On May 11, 2015, Aliya and the third party defendants filed motions to dismiss the counterclaim and third party complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure; the motions are supported by a single memorandum.[3] CTB opposes the motions.[4] Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument; the hearing calendared for July 13, 2015, is therefore vacated, and the matter taken off calendar.

# I. FACTUAL BACKGROUND

## A.    Facts Alleged in Aliya's Second Amended Complaint

Aliya is in the business of factoring.[5]   The complaint alleges that Nickell is a successful pharmacist and businessman who owns and controls multiple undercapitalized shell entities through which he conducts a multimillion dollar medical services business.[6]   One such entity is CTB, which provides toxicology services – specifically urinalysis – to patients with workers' compensation claims. As relevant here, instead of charging patients directly for toxicology services, CTB allegedly invoices an insurance company that provides coverage for the services.[7]   The right to receive payments from insurance providers is purportedly a receivable that is often marketed and sold to third parties that factor receivables.   CTB has allegedly originated thousands of such receivables, each of which typically

---

Companies International, LLC was also named in the third party complaint, but CTB voluntarily dismissed it on May 8, 2015.  (See Notice of Dismissal, Docket No. 93 (May 8, 2015).)

[3]Memorandum in Support of Motions to Dismiss Counterclaim and Third Party Complaint ("Motion"), Docket No. 97 (May 11, 2015).

[4]Opposition to Motions to Dismiss ("Opposition"), Docket No. 113 (June 22, 2015).

[5]"Factoring is . . . the sale of accounts receivable of a firm to a factor at a discounted price.  In return for selling the accounts receivable at a discounted price, the seller receives two immediate advantages: (1) immediate access to cash; and (2) the factor assumes the risk of loss." *In re Straightline Investments, Inc.*, 525 F.3d 870, 883 (9th Cir. 2008).

[6]Second Amended Complaint ("SAC"), Docket No. 109 (June 18, 2015), ¶ 6.

[7]*Id.*, ¶¶ 8-9.

2

1  represents a bill of $800 to $1,400.[8]

2  **1.    The Factoring, Non-Competition, and Indemnification Agreements**

3  Beginning in the fourth quarter of 2012 and continuing to the first quarter of 2013, CTB and

4  Aliya allegedly entered into three factoring agreements pursuant to which Aliya purchased existing CTB

5  receivables and an exclusive right to acquire all right, title, and interest to CTB's future receivables for

6  a period of five years.[9]   The first agreement, which was executed in November 2012, documented

7  Aliya's purchase of $7.9 million of CTB's receivables;[10] the second agreement, which was executed in

8  February 2013, reflected Aliya's purchase of $4.1 million of CTB's receivables,[11] while the third

9  agreement, executed in March 2013, documented Aliya's purchase of $18 million of CTB's

10  receivables.[12]  The third agreement also gave Aliya the exclusive right to purchase all of CTB's future

11  receivables for five years, or until January 2018.[13]  Aliya asserts that by entering into the agreements,

12  it acquired the right to receive all payments made on all of CTB's existing receivables as well as all

13  future receivables through January 2018.[14]  To induce Aliya to enter into the third agreement and pay

14  in excess of $4 million for the receivables being purchased, Nickell purportedly executed and delivered

15  a covenant not to compete and a covenant to indemnify.[15]  The non-competition clause allegedly

16  required all entities affiliated with CTB (the "Nickell entities"), including Exec Billing, to acknowledge

17  that they and their respective managers, including Nickell, would conduct all toxicology business solely

18  through CTB – for Aliya's benefit – and ensure that they operated in such a way that all receivables

19

20  [8]*Id.*, ¶ 39.

21  [9]*Id.*, ¶ 41.

22  [10]*Id.*, ¶ 42.  See also *id*., Exh. A ("First Agreement").

23  [11]*Id.*, ¶ 43.  See also *id*., Exh. B ("Second Agreement").

24  [12]*Id.*, ¶ 44.  See also *id*., Exh. C ("Third Agreement").

25  [13]*Id.*, ¶ 44.

26  [14]*Id.*, ¶ 47.

27  [15]*Id.*, ¶ 45.  See also *id*., Exh. D ("Non-Compete"), Exh. E ("Indemnification Agreement").

28

generated were subject to the third agreement.[16]   In the indemnification clause, the Nickell entities allegedly promised to indemnify Aliya for any loss caused by CTB's breach of the third agreement.

Aliya, for its part, agreed to purchase all of CTB's receivables without conducting any due diligence; in exchange, it negotiated a provision that permitted it to return any and all receivables that failed to meet certain criteria.[17]  Thus, section 14 of the third agreement provided that Aliya would "have the right, at any time, to reject any [r]eceivable that, in [Aliya's] judgment, meets or includes one or more of the following criteria. . . ."[18]  By way of example, the criteria set forth in section 14 permitted Aliya to reject receivables that represented claims or charges "requested by a physician of record [who is] not within the applicable 'Medical Provider Network' [("MPN")]," i.e., claims presented by out-of-network providers.[19]  Section 14 also provided that if Aliya rejected a receivable based on any of the enumerated criteria, CTB would "have the opportunity to object to [Ailya's] classification of [the] [r]eceivable as [rejectable] within 10 days of receiving notice thereof[;] . . . the parties [ ] agree[d] to make a 'good faith effort to mutually determine whether the cause of such [r]eceivable becoming [rejectable] [could] be cured by [CTB] within a commercially reasonable time."  "With respect to any [r]ejected [r]eceivable [as to which CTB could not cure], an amount equal to the applicable [p]urchase [p]rice . . . [was to] be deducted from the immediately following [m]onthly [f]unding [a]mount, or, in the event that no [t]ransaction [m]onth remain[ed] . . . [CTB] [was obligated to] pay the applicable [p]urchase [p]rice for such [r]eceivable to [Aliya] within five [ ] business days."[20]  Rejected receivables were deemed to belong to CTB; as a result, the agreement provided that CTB could "collect on or sell" any rejected receivable.[21]

---

[16]*Id.*, ¶ 46.

[17]*Id.*, ¶ 54.

[18]*Id.* (emphasis removed).  See also Third Agreement, § 14.

[19]Third Agreement, § 14(f).

[20]Third Agreement, § 14.

[21]*Id.*

Aliya alleges that it purchased an additional $52.6 million of future receivables from CTB under the third agreement.  In total, it contends it has purchased "all of CTB's receivables, which amounts to over $83 million of receivables."[22]

### 2.    Alleged Misrepresentations Concerning In-Network Doctors

The third agreement allegedly required that all receivables represent charges by referring physicians who were "in-network."[23]  At the time it entered into the third agreement, Aliya had become increasingly concerned that providers be in-network because California Senate Bill 863 had taken effect in January 2013, and Aliya believed insurance companies would begin to scrutinize whether a provider was in-network more closely, which in turn would materially affect the collectability of receivables representing charges submitted by out-of-network providers.[24]  To assuage these concerns, Nickell purportedly represented in telephone conversations and meetings at his office that the doctors ordering toxicology services from CTB were in-network.[25]  This representation allegedly proved false.  Aliya asserts that initially it did not know the number of receivables being denied by insurance companies because the referring physician was out-of-network.  CTB purportedly handled collection and servicing of accounts, pursuant to an agreement between the parties, until June 2013.  At that time, Aliya formed its own in-house collections department.[26]  Soon after it began handling collections in house, Aliya allegedly "noticed that insurance companies had denied payment of a large number of receivables

---

[22]SAC, ¶¶ 48-49.

[23]*Id.*, ¶ 50.

[24]*Id.*, ¶ 52. S.B. 863 provided, *inter alia*, "that a treating physician be included in the network only if the physician or authorized employee of the physician gives a separate written acknowledgment that the physician is a member of the network, and . . . require[d] every medical provider network to include one or more persons employed as medical access assistants to help an injured employee find an available physician and assist employees in scheduling appointments."  See 2012 Cal. Legis. Serv. Ch. 363 (S.B. 863).

[25]*Id.*, ¶ 53.

[26]*Id.*, ¶ 57.

because the referring physician was out-of-network."[27]  It contends it did not know this earlier because CTB did not provide any documentation from insurance companies; it purportedly communicated only the amount paid by insurers and remitted that amount to Aliya.[28]  By September 2013, insurers' denial of claims submitted by out-of-network physicians allegedly totaled millions of dollars.[29]  When Aliya confronted Nickell, he purportedly denied that any doctors were out-of- network; he asserted that insurers offer any reason, including a blatantly false one, to avoid payment.[30]

Once it learned of the out-of-network problem, Aliya purportedly formed a team of dedicated staff to research whether the physicians referring toxicology business to CTB were actually within the applicable MPN, as Nickell had represented and confirmed.[31]  Its investigation focused on the network status of 26 physicians that "collectively referred the vast majority of CTB's business," and 44 insurance companies that were "the most common payors with respect to the receivables."[32]  It learned that only four of the 26 physicians had in-network status with at least one of the 44 payors; none had in-network status with more than two of the 44 insurance companies.[33]

Aliya presented the results of its research to Nickell at a meeting on October 8, 2013.  After reviewing it, Nickell purportedly said that Aliya's staff was incompetent and maintained that all physicians referring business to CTB were in-network providers of virtually every relevant insurance company.[34]  Nickell allegedly said he would contact one of the twenty-six physicians and obtain

[27]*Id.*, ¶ 58.

[28]*Id.*, ¶ 59.

[29]*Id.*, ¶ 60.

[30]*Id.*

[31]*Id.*, ¶ 61.

[32]*Id.*

[33]*Id.*

[34]*Id.*, ¶ 62.

documentation proving that he was within "all MPNs," but never did so.[35]  In fact, Aliya asserts that Nickell and CTB finally admitted that the "vast majority" of the referring doctors were not within the applicable MPN.[36]  At that point, the parties sought to negotiate a mutually agreeable solution.[37]

### 3.    Aliya's Rejection of Certain Receivables and CTB's Alleged Failure to Provide Reasonable Assurances Concerning Repayment

When no resolution could be reached, on October 19, 2014, Aliya formally rejected $17,650,096.36 of receivables; it asserted that the receivables were properly rejected under section 14(f) of the third agreement because the referring physicians were out-of-network.[38]  It requested a refund of $3,654,224.50, the purchase price it paid for the receivables.[39]  Simultaneously, it asked that CTB provide reasonable assurances that it would pay the refund; this was done, Aliya asserts, because it believed CTB could not pay Aliya "any significant amounts based on statements made by Nickell."[40]  In particular, Nickell had allegedly stated that CTB had no remaining assets, because its only assets were the receivables it had sold to Aliya, and that he would be willing to transfer ownership of CTB to Aliya for nominal consideration of $1.[41]  On the basis of this statement, Aliya contends it reasonably assumed that the millions of dollars it paid CTB for receivables had already been distributed to Nickell or otherwise dissipated.[42]  It concluded that CTB was a special purpose entity created solely to originate and hold receivables, with no other assets or liabilities.

Following Aliya's refund request, CTB had ten days, i.e., until October 29, 2014, to notify Aliya

---

[35]*Id.*

[36]*Id.*, ¶ 63.

[37]*Id.*

[38]*Id.*, ¶ 64.

[39]*Id.*

[40]*Id.*, ¶ 65.

[41]*Id.*, ¶ 66.

[42]*Id.*

of any objection to Aliya's rejection of the receivables under section 14(f).  CTB provided a response on that date; Aliya contends, however, that the response provided no substantive basis for the objection.[43]  Specifically, it purportedly did not identify any receivable that represented a claim submitted by an in-network physician.[44]  In addition, CTB did not request a reasonable time to cure, despite having the right to do so under the terms of the third agreement.[45]

CTB's response also allegedly offered no assurance that it could pay Aliya $3,654,224.50.[46]  Thus, Aliya did not transfer title to the receivables despite being ready, willing, and able to do so.[47]  It contends its obligation to transfer title to the receivables to CTB was excused because it had a reasonable basis for believing that CTB would not remit the purchase price of the receivables as it had not given reasonable assurances it would.  Alternatively, Aliya alleges that tender of the rejected receivables was excused because the law does not require a useless act.[48]  CTB therefore had until November 3, 2014 to pay Aliya $3,654,224.50.  It did not do so.  Instead, it asserted through an attorney that it did "not owe Aliya a dime."[49]  Aliya contends that CTB's course of conduct shows it lacked sufficient funds to pay the amount it was owed for the rejected receivables.[50]  It also asserts that CTB's response, i.e., that it did not owe the money, constituted a repudiation of Aliya's refund rights under section 14(f).

---

[43] *Id.*, ¶ 69.

[44] *Id.*, ¶ 70.

[45] *Id.*

[46] *Id.*, ¶ 72.

[47] *Id.*

[48] *Id.*, ¶ 73.

[49] *Id.*, ¶ 74.

[50] *Id.* ¶ 75.

### 4. Nickell's and CTB's Alleged Refusal to Honor Aliya's Right to Reject Receivables for Charges Associated With Already Paid or Settled Workers' Compensation Claims

Aliya alleges that insurance companies will not pay receivables for medical services when there is no longer an ongoing workers' compensation claim; thus, the parties agreed that Aliya would be permitted to reject any receivables and seek refund of the purchase price if the receivables concerned services rendered after the underlying insurance claim had been settled, paid, or adjudicated.[51]  Aliya contends that CTB sold it at least $2,074,577 of receivables representing medical services rendered after the underlying claim had been settled, paid, or adjudicated.[52]  It contends it paid $145,356.95 for these receivables, and that after it rejected them, CTB refused to refund the purchase price or issue a corresponding credit.[53]

### 5. Nickell's and CTB's Alleged Sale of Receivables That Had Previously Been Collected In Full and Failure to Return the Purchase Price of the Receivables

In or about June 2014, Aliya purportedly discovered that CTB had sold receivables to it that had already been paid by insurers; the purchase price for the receivables was $256,706.46.[54]  Aliya contends the receivables were paid as early as January 2012, or ten months before CTB and Aliya entered into the first agreement.  Because CTB and Nickell had ample time to remove the paid receivables from the group being sold to Aliya, Aliya asserts they knew, or reasonably should have known, that they were selling receivables that had already been paid and hence were worthless.  Aliya alleges that Nickell and CTB concealed the fact the receivables had been paid.[55]

Even if defendants did not act fraudulently, Aliya contends that CTB is contractually obligated

---

[51]*Id.*, ¶ 82; Third Agreement, § 14(d)-(e).

[52]SAC, ¶ 83.

[53]*Id.*, ¶ 84.

[54]*Id.*, ¶ 85.

[55]*Id.*, ¶ 88.

1    to remit the funds paid on these receivables and/or issue a credit equal to their purchase price at closing

2    under section 12 of the third agreement.[56]  That section, titled "Reconciliation," provides:

3           "All monies related to the Receivables, which have already been received by Provider

4           and not properly recorded against the listing of the Receivables in Exhibit A, will be

5           immediately credited to Buyer at the time of the closing.  All monies received by

6           Provider after the execution of this contract and before funding related to the

7           Receivables, will be turned over to Buyer in good funds, at the closing.  All monies

8           received by Provider after the funding related to Receivables will be turned over to

9           Buyer in good funds within 48 hours of receipt."[57]

10          On July 3, 2014, Aliya allegedly exercised its rights under section 12 and made a claim for

11   $256,706.46 based on its purchase of receivables that had already been paid to CTB by insurers.[58]  CTB

12   purportedly did not respond until September 12, 2014, at which time it acknowledged that it had verified

13   receipt of slightly less than the amount sought by Aliya, or $229,467.09.[59]  CTB and Nickell purportedly

14   refused to tender that amount, despite being obligated to do so under section 12.[60]

15                **6.     Nickell's Alleged Diversion of Business That Belonged to Aliya**

16          Beginning in or about October 2013, CTB allegedly began to divert urinalysis business in

17   violation of the third agreement and non-competition clause.[61]  Aliya contends that, to date, Nickell has

18   diverted approximately $18 million of business to various shell companies controlled by him.[62]  As

19   evidence of this purported diversion, Aliya alleges that the monthly average of receivables from April

20

21          [56]Id.

22          [57]Third Agreement, § 12.

23          [58]SAC, ¶ 91.

24          [59]Id.

25          [60]Id., ¶ 92.

26          [61]Id., ¶ 111.

27          [62]Id.

28
                                              10

to October 2013 was $5.2 million.[63]   Suddenly, however, in November 2013, the volume dropped dramatically; the monthly average from November 2013 to August 2014 was only $1.6 million.[64] Nickell purportedly stated that the drop was a result of the fact that competitors had aggressively solicited CTB's business.[65]   This explanation was purportedly false; Aliya asserts that in fact Nickell diverted toxicology business from CTB to other shell companies he owned.[66]   It contends Nickell intended to divert business from the very beginning of the parties' relationship, and never intended to comply with the exclusivity provisions of the third agreement and non-competition clause.[67]

### 7.   Aliya's Termination of the Third Agreement and CTB's Withholding of Payments on Aliya's Receivables

As a result of CTB's allegedly wrongful actions, Aliya terminated the third agreement on November 5, 2014, giving CTB notice that it would not purchase further receivables in the future.[68] Aliya contends that given CTB's multiple breaches of the agreement, it was entitled to terminate.   The first and second agreements were purportedly not terminated, however.[69]

Since the time Aliya terminated the third agreement, Nickell and CTB have purportedly begun to withhold payment on all receivables purchased by Aliya.[70]   Aliya alleges that to date, CTB has withheld more than $600,000 of payments it is owed.[71]   Nickell and CTB have also purportedly obstructed Aliya's efforts to collect and service the receivables it owns, and begun their own aggressive

---

[63]*Id.*, ¶ 112.

[64]*Id.*

[65]*Id.*, ¶ 113.

[66]*Id.*, ¶¶ 113-14.

[67]*Id.*, ¶ 188.

[68]*Id.*, ¶ 126.

[69]*Id.*, ¶ 127.

[70]*Id.*, ¶ 128.

[71]*Id.*

collection activities respecting those receivables to maximize the amount they can withhold and convert to their own use.[72]

Each of the parties' three agreements required that CTB open an account into which checks representing payments on the receivables Aliya had purchased were to be deposited.  CTB was required to send the checks, uncashed, to the account on the day they were received from the insurance company.  This was purportedly done to ensure that funds would not be commingled and that Aliya would not be subjected to risk in the event CTB became insolvent.[73]  The agreements contained a "non-diversion guarantee" clause that required CTB to remit proceeds within 48 hours of receipt.[74]  Aliya contends that the non-diversion guarantees survive termination of the third agreement.[75]  CTB purportedly never opened the depository account, and failed to remit proceeds within 48 hours in direct violation of these provisions.[76]  Instead, it purportedly deposited insurance checks in its own account and commingled the funds with its own.[77]

Aliya alleges that Nickell has used the receivable payments to fund other investments and businesses.[78]  It provides one example that purportedly demonstrates how he has misused the funds:

"[I]n the beginning of 2014 [Nickell] unilaterally decided to hold on to Aliya's funds for up to seven weeks before finally paying Aliya in two installments on February 27 ($515,758) and March 5 ($534,696).  Based on information and belief, these dates coincide with Nickell's refinancing of a commercial building that he owns through one of his other entities (Kashiwa Court, LLC).  Nickell refinanced this building in two

---

[72]*Id.*

[73]*Id.*, ¶¶ 130-31 (citing Third Agreement, §§ 4, 8).

[74]*Id.*, ¶ 132 (citing First Agreement, § 12; Second Agreement, § 16; Third Agreement, § 19).

[75]*Id.*

[76]*Id.*, ¶¶ 131, 133.

[77]Id., ¶ 134.

[78]*Id.*

separate transactions on February 26 and March 4, respectively, in each case the day prior to paying Aliya past overdue amounts.  Nickell took the liberty to hold on to Aliya's funds at his discretion until such time that his refinance transactions had closed."[79]

When CTB eventually wired the funds to Aliya, it allegedly did so only after deducting certain "arbitrary costs that CTB chose to assess to Aliya."[80]  Aliya alleges that CTB has charged more than $147,000 in "improper and bogus servicing costs."[81]  Since November 5, 2014, moreover, CTB has purportedly continued to cash checks from insurers, and refused to provide any of the proceeds to Aliya.[82]  On November 14, 2014, Aliya's attorney allegedly sent CTB's lawyer an email stating that Aliya had not received any funds from collections; he asked that CTB pay the funds and work with Aliya to establish a lockbox account.

Aliya contends that CTB has no right to withhold the funds under the agreements or Nevada law,[83] which governs the contracts.  It maintains that under section 2 of the first and second agreements, and section 3 of the third agreement, all right, title and interest to the receivables was transferred to Aliya, and that CTB has no right to the proceeds.[84]  Aliya also contends that, even if the agreements did not contain such a provision, Nevada law provides that once a debtor like CTB has sold "an account, chattel paper, payment intangible or promissory note [it] . . . retain[s] [no] legal or equitable interest in the collateral sold."[85]  Thus, it asserts that even if CTB has the right to collect the rejected receivables, the first and second agreements remain binding and hence it must remit proceeds collected on

---

[79]*Id.*, ¶ 135.

[80]*Id.*, ¶ 136.

[81]*Id.*

[82]*Id.*, ¶ 137.

[83]Nevada law governs the first, second, and third agreements.  (See First Agreement, § 27; Second Agreement, § 30; Third Agreement, § 33.)

[84]SAC, ¶ 138.

[85]*Id.*, ¶ 139 (citing NEV.REV.STAT. § 104-9318(a)).

13

receivables subject to those agreements to Aliya.[86]

It also contends that the non-diversion guarantee in the third agreement expressly survives termination of the agreement, and that CTB must therefore turn over payments received on receivables subject to that agreement as well.[87]  As a consequence, Aliya maintains that it holds title to the receivables it purchased and is entitled to possession of the proceeds.[88]  In addition to withholding proceeds from Aliya, Nickell and CTB also purportedly locked Aliya out of Conexem – the billing and collection software used to collect CBT's receivables.  Defendants did so despite the fact that they were allegedly obligated to give Aliya access to the software under each of the agreements.[89]  Aliya relies substantially on Conexem's tools to manage the receivables it has purchased.  It asserts:

"Without access to Conexem virtually no employee duties can be performed sufficiently. For example, Aliya's employees are unable to collect on their assigned receivables because they do not have access to all the necessary information needed (accounting information, insurance correspondence and contact information, case history, notes, medical documents, patient information etc.).  Without up-to-date accounting information the billing department cannot keep in accordance with current California Workers' Compensation law and deadlines, which depreciates the potential recovery amount leading to accrued losses.  Without access to the court calendar for the claims,

---

[86]Id., ¶ 140.

[87]Id., ¶ 141.  See also Third Agreement, § 19 ("[A]ny proceeds with the respect to the Receivables, will be promptly turned over to Buyer via wire transfer within 48 hours, along with the respective explanation of benefits/remittance advices, pertaining to such proceeds. This Non-Diversion Guaranty from Provider will survive this Agreement").

[88]SAC, ¶ 142.

[89]Id., ¶ 150.  Specifically, the agreements provide: "[Aliya's] purchase of the Receivables also includes (i) full title and ownership to Provider's books, records, billing and credit files, medical and patient records, chattel paper, and documents, related to the Receivables, together with all rights, remedies, liens, security Interests, guarantees and other information necessary to collect the Receivables, including, without limitation, access to all records residing on the Provider's computer hardware, computer equipment and billing and collection software, including but not limited to, Provider's billing and collections system and [Aliya's] right to use such system(s) as [Aliya] requires to collect the Receivables."  (See First Agreement, § 3; Second Agreement, § 3; Third Agreement § 4.)

1    the legal department will not know about, nor will they be able to prepare for, court

2    appearances, causing our receivables to be dismissed with potential for sanctions and

3    losses."[90]

4    CTB has also allegedly failed to turn over mail or copies of mail received concerning the receivables.[91]

5    Aliya contends that most insurers and the Workers' Compensation Appeals Board communicate

6    concerning receivables by mail. Without access to mailed correspondence, Aliya lacks knowledge of

7    receivable activity and cannot collect the amounts owed.[92]  Aliya contends that CTB's failure to provide

8    these documents violates its exclusive and irrevocable right to manage and collect the receivables.  It

9    cites section 24 of the third agreement, which states that CTB "hereby appoints Buyer as its

10   attorney-in-fact to exercise at any time, at Buyer'[s] cost and expense, any or all of the following

11   powers: to make collection efforts in Provider's name that Buyer deems necessary or desirable."[93]  This

12   right purportedly survives termination of the third agreement.[94]  Aliya thus asserts that CTB has

13   breached the contracts by interfering with its right to collect receivables and with its right to transfer or

14   assign receivables; it contends no buyer would purchase the receivables while Nickell and CTB continue

15   their allegedly illegal acts.[95]

16       **B.    Facts Alleged in the Counterclaim and Third Party Complaint**

17       CTB alleges that it is a medical billing company that purchases accounts receivable – e.g.,

18   bills from insurance companies, such as those for toxicology tests covered by workers'

19

20

21   _____

22       [90]SAC, ¶ 153.

23       [91]Id.

24       [92]Id., ¶¶ 154-55.

25       [93]Third Agreement, § 24.

26       [94]SAC, ¶ 164 (citing Third Agreement, § 24 ("Provider agrees that the foregoing powers are
     coupled with an interest and that they shall be irrevocable until all Liens purchased by Buyer and all
27   other amounts which may be owed by Provider to Buyer have been paid in full").)

28       [95]Id., ¶ 166.

compensation insurance – and collects them.[96]  In January 2012, CTB allegedly purchased accounts receivable from Chematox, a non-party toxicology testing company that bills insurance companies and thus generates accounts receivable related to patients who have claims covered by workers' compensation insurance.[97]  Since January 2012, CTB has purportedly developed a "good reputation" in the workers' compensation industry and even established trademark rights in the "COMPREHENSIVE TOXICOLOGY BILLING" and "COMPREHENSIVE TOXICOLOGY" trademarks, service marks, and trade names.[98]

### 1.    The First, Second, and Third Agreements

In late 2012 and early 2013, Aliya and Aliya International (who is not a party to this lawsuit) allegedly entered into a series of purchase agreements with CTB to acquire CTB's accounts receivable.[99]  The first purchase agreement covered CTB's existing receivables.[100]  The second purchase agreement sold Aliya additional CTB receivables.[101]  The third purchase agreement sold additional CTB receivables, as well as all future receivables through December 31, 2018.[102]

### 2.    Modification of the Third Agreement

CTB alleges that the third agreement was modified on November 23, 2013, after Aliya's principal, Erik Nord, demanded that CTB repurchase $600,000 in receivables pursuant to paragraph 14(f) of the third agreement; this provision required that CTB repurchase toxicology receivables reflecting services performed by physicians outside the "medical provider network."[103]  Nord, on

---

[96]Counterclaim, ¶¶ 8-9; TPC, ¶¶ 15-16.

[97]*Id.*

[98]Counterclaim, ¶¶ 10-12; TPC, ¶¶ 17-19.

[99]Counterclaim, ¶ 13; TPC, ¶ 20.

[100]Counterclaim, ¶ 14; TPC, ¶ 21; see Complaint, Exh. A.

[101]Counterclaim, ¶ 14; TPC, ¶ 21; see Complaint, Exh. B.

[102]Counterclaim, ¶ 14; TPC, ¶ 21; see Complaint, Exh. C.

[103]Counterclaim, ¶¶ 15-18; TPC, ¶¶ 22-25.

behalf of Aliya and Aliya International, and Robert Nickell and Joseph De Kellis, on behalf of CTB, purportedly agreed to the modification.[104]   CTB asserts that the modified agreement terminated Aliya's right to reject and require repurchasing of receivables in exchange for CTB's agreement to cease selling it receivables generated by physicians Aliya identified.   The agreement also purportedly gave Aliya the right to cease purchasing receivables generated by certain physicians that it would identify.[105]   CTB alleges that, after the agreement was modified, it no longer sold Aliya receivables generated by physicians Alyia identified.[106]

### 3.      Aliya's Purported Breach of the Modified Third Agreement

Beginning in 2014, Aliya allegedly began to reject the terms of the modified agreement.  On October 19, 2014, it formally rejected approximately 13,000 receivables under paragraph 14(f) of the original version of the third agreement.  CTB contends that Aliya modified and/or waived its right to rely on this provision.[107]   Nonetheless, Aliya asked that CTB repurchase the receivables it had rejected for $3.65 million.[108]  After CTB objected on October 29, 2014, Aliya "unilaterally and unlawfully" terminated the third agreement and its business relationship with CTB on November 5, 2014.[109]  CTB retained a third party to continue collecting CTB's receivables after that date; it alleges, however, that Aliya "bullied" the third party until it withdrew its services, leaving CTB to collect the receivables and place the proceeds in a separate bank account pending the resolution of this lawsuit.[110]

---

[104]Counterclaim, ¶ 18; TPC, ¶ 25.

[105]Id.

[106]Counterclaim, ¶ 19; TPC, ¶ 26.

[107]Counterclaim, ¶ 21-22; TPC, ¶ 28-29.

[108]Counterclaim, ¶ 23; TPC, ¶ 30.

[109]Id.

[110]Counterclaim, ¶¶ 24-26; TPC, ¶¶ 31-33.

### 4.   Post-Termination Conduct by Aliya

Following Aliya's failed attempt to obtain a temporary restraining order, in approximately November 2014, Aliya purportedly began to impersonate CTB, using a "sham entity," CTS, to divert receivables payments from CTB to CTS.[111]   CTB alleges that Nord and Sten instructed Aliya employees and third-party defendants Alvarado, Samani, and Upton Park to use the intentionally misleading name "Comprehensive Toxicology" on documents,[112] and to use an intentionally misleading and confusing email domain name, "ctbcollect.com."[113]   Aliya also purportedly submitted a false change of address notice to the U.S. Postal Service in December 2014, which diverted CTB's mail to CTS.[114]   CTB contends Aliya has used these misleading identifiers to communicate with insurance companies and enter into settlement agreements for amounts that are often less than 15% of the face value of the receivables in question; that it has rebilled insurance companies whose claims have already been settled; and that it has even used CTB's federal tax identification number in connection with the settlement of receivables.[115]

### 5.   CTB's Claims Against Aliya and the Third Party Defendants

CTB asserts six causes of action against Aliya in its counterclaim: (1) breach of contract; (2) false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); (3) state law trademark infringement and common law unfair competition under California law; (4) breach of fiduciary duty; (5) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.*; and (6) an accounting.   The third party complaint alleges the second through sixth causes of action in the counterclaim against the third party defendants.   It does not allege a breach of contract claim.

---

[111]Counterclaim, ¶¶ 27-29; TPC, ¶¶ 34-36.

[112]Counterclaim, ¶ 29; TPC, ¶ 36.

[113]Counterclaim, ¶ 30; TPC, ¶ 37.

[114]Counterclaim, ¶¶ 33-34; TPC, ¶¶ 40-41.

[115]Counterclaim, ¶¶ 31-36; TPC, ¶¶ 38-43.

1         **C.    Procedural Posture**

2       On November 20, 2014, Aliya filed an *ex parte* application for temporary restraining order.[116]

3 It sought an order requiring defendants to (1) transfer to Aliya all funds received to date as payment

4 on receivables Aliya had purchased from CTB; (2) continue to transfer to Aliya, until the conclusion

5 of a trial on the merits, all funds received as payment on receivables Aliya had purchased from CTB;

6 (3) give Aliya any and all documentation received concerning receivables it had purchased; (4) give

7 Aliya access to the billing and collection software used to manage and collect the receivables it had

8 purchased from CTB; and restraining defendants from (5) managing, controlling, collecting, or

9 taking any action with respect to receivables Aliya had purchased from CTB except as provided in

10 items (1)-(4) above.[117]   On November 26, 2015, the court denied Aliya's application because it had

11 not adequately shown that it would suffer imminent, irreparable harm if an injunction were not

12 entered.[118]

13       On December 18, 2014, Aliya filed a first amended complaint.[119]   The first amended

14 complaint alleged eleven claims.[120]   It pled claims against Nickell and CTB for fraud in the

15 inducement of the factoring agreement; fraudulent concealment; promissory fraud; negligent

16 misrepresentation; and conversion.[121] It also alleged separate breach of contract claims against CTB

17 and Exec Billing;[122] intentional interference with contractual relations and violation of California

18 ─────────────

19     [116]*Ex Parte* Application ("Application"), Docket No. 8 (Nov. 20, 2014).

20     [117]*Id*. at 1; [Proposed] Temporary Restraining Order and Order to Show Cause Re: Preliminary
21 Injunction, Docket No. 8-1 (Nov. 20, 2014) at 1-2.

22     [118]Order Denying *Ex Parte* Application for a Temporary Restraining Order, Docket No. 20 (Nov.
23 26, 2014).

24     [119]First Amended Complaint ("FAC"), Docket No. 23 (Dec. 18, 2014).

25     [120]The first (and the second) amended complaint abandoned a breach of the covenant of good
26 faith and fair dealing claim and added a UCL claim against Nickell.  The first amended complaint
otherwise asserted the same claims as the original complaint.

27     [121]The conversion claim is also alleged against the various fictitious defendants.

28     [122]The breach of contract claim against Exec Billing also names various fictitious defendants.

Business and Professions Code § 17200 claims against Nickell; and claims for an accounting and imposition of a constructive trust against all defendants.

On January 30, 2015, defendants filed a motion to dismiss the first through fourth and sixth through tenth claims; they did not seek dismissal of Aliya's fifth claim for breach of contract against CTB or eleventh claim for an accounting.[123] On May 26, 2015, the court granted in part and denied in part defendants' motion.  It declined to dismiss Aliya's fraudulent inducement, negligent misrepresentation, and conversion claims, but dismissed the remaining claims on which defendants sought dismissal with leave to amend.[124]  Aliya filed a second amended complaint on June 18, 2015.[125]

On May 11, 2015, Aliya and third party defendants filed motions to dismiss the counterclaim and third party complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[126]  Aliya does not seek dismissal of the breach of contract claim or accounting claim.  It does move to dismiss the federal and state unfair competition claims, however, as well as the UCL and breach of fiduciary duty claims.  The third party defendants seek dismissal of all claims against them.

## II.  DISCUSSION

### A.    The Parties' Requests for Judicial Notice

#### 1.    Aliya and Third Party Defendants' Request

Aliya seeks to have the court take judicial notice of the first, second, and third agreements.[127]

---

[123]Notice of Motion and Motion to Dismiss First Amended Complaint ("Motion"), Docket No. 44 (Jan. 30, 2015); see also Reply in Support of Motion to Dismiss ("Reply"), Docket No.  91 (Apr. 20, 2015).

[124]Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Docket No. 100 (May 26, 2015).

[125]See SAC.

[126]See Motion at 1.

[127]Aliya's Request for Judicial Notice ("Aliya's RJN"), Docket No. 98 (May 11, 2015).

20

1    Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material

2    outside the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such

3    a motion. *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537

4    (9th Cir. 1996). The court may, however, properly consider exhibits attached to the complaint and

5    documents whose contents are alleged in the complaint but not attached, if their authenticity is not

6    questioned. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

7        In addition, the court can consider matters that are proper subjects of judicial notice under Rule

8    201 of the Federal Rules of Evidence. *Id.* at 688-89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.

9    1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.

10   2002); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.

11   1990); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

12   322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts

13   ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

14   incorporated into the complaint by reference, and matters of which a court may take judicial notice").[128]

15   The court is "not required to accept as true conclusory allegations which are contradicted by documents

16   referred to in the complaint" or which are the proper subjects of judicial notice. *Steckman v. Hart*

17   *Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998); see also *Sprewell v. Golden State Warriors*, 266 F.3d

18   979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters

19   properly subject to judicial notice or by exhibit").

20       The court cannot judicially notice the agreements, because their contents are neither generally

21   known nor capable of accurate and ready determination by resort to sources whose accuracy cannot

22   reasonably be questioned. FED.R.EVID. 201. "A district court ruling on a motion to dismiss[, however,]

23   may consider a document the authenticity of which is not contested, and upon which the plaintiff's

24   complaint necessarily relies." *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir. 1998), superseded by

25   statute on other grounds as recognized in *Abrego Abrego v. The Dow Chem. Co.,* 443 F.3d 676, 681 (9th

26

27       [128]Taking judicial notice of matters of public record does not convert a motion to dismiss into
     a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

28   1986).

Cir. 2006). This is so even if the plaintiff does not "explicitly allege the contents of th[e] document[s] in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint"). Here, the agreements are essential to CTB's claims, and CTB does not dispute the authenticity of the documents; the court will therefore consider the agreements under the incorporation by reference doctrine.

Aliya and third party defendants also filed a supplemental request for judicial notice, asking that the court consider a covenant not to compete and indemnity agreement purportedly signed by Robert Nickell; a W-9 signed by third party defendant Henrik Sten; and confirmation letters from the U.S. Postal Service regarding a December 2014 change of address filed by third party defendant CTS.[129] They contend that these documents are incorporated by reference in the counterclaim and third party complaint; they do not cite any particular allegation in either pleading referencing the documents, however. The pleadings do reference a change of address submitted to the U.S. Postal Service. For that reason, the court will therefore consider the confirmation of change of address letter from the U.S. Postal Service.[130] The court cannot identify any other allegations in the counterclaim and third party complaint that reference the remaining documents, however. Consequently, the court declines to consider them in deciding the motions.

### 2. CTB's Request

CTB requests that the court take judicial notice of two decisions of the California Worker's Compensation Appeals Board ("WCAB") that relate to claims CTB and CTS are attempting to collect. "It is well established that federal courts may take judicial notice of related state court orders and proceedings." *ScripsAmerica, Inc. v. Ironridge Global LLC*, 56 F.Supp.3d 1121, 1136 (C.D. Cal. 2014);

---

[129]Supplemental Request for Judicial Notice ("Aliya's Supp. RJN"), Docket No. 118 (June 29, 2015).

[130]Aliya's Supp. RJN, Exh. I ("USPS Change of Address").

see *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (stating that an appellate court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Dawson v. Mahoney,* 451 F.3d 550, 551 (9th Cir. 2006) (taking judicial notice of state court orders and proceedings); *Farahani v. Floria,* No. 12-CV-04637-LHK, 2013 WL 1703384, *1 n. 1 (N.D. Cal. Apr. 19, 2013) ("The remaining documents submitted for judicial notice are all documents filed in previous and concurrent lawsuits, which are similarly suitable for judicial notice under Fed.R.Evid. 201(b)").

The two decisions that are the subject of CTB's request include findings that two entities had appeared asserting rights lien holders; CTB asserts the findings support its allegations that Aliya and third party defendants are impersonating it. The court, however, cannot take judicial notice of the truth of facts determined by the WCAB. "On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Lee*, 250 F.3d at 690 (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426-27 (3rd Cir. 1999)). Because CTB seeks to have the court judicially notice these documents solely for the truth of the information contained in them, the court denies the request for judicial notice.

### B.    Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### C.    Whether CTB's Third Party Complaint Is Proper

Third party defendants maintain that CTB's filing of a third party complaint is improper. They assert that it should have filed a counterclaim against Aliya, and named them as counter-defendants. The court agrees that the procedure third party defendants identify is the proper method of alleging claims against them. Rule 13 of the Federal Rules of Civil Procedure governs the pleading of counterclaims. See FED.R.CIV.PROC. 13(a), (b). As relevant here, the rule provides that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim." FED.R.CIV.PROC. 13(h). Rule 20 states that a party may be added as a defendant where "any right to relief is asserted against [the party] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and [ ]  any question of law or fact common to all defendants will arise in the action." FED.R.CIV.PROC. 20(a)(2). That standard is easily met with respect to CTB's claims against the third party defendants. Thus, CTB should have filed a counterclaim and added the third party defendants as counter-defendants

Instead, CTB filed a third party complaint under Rule 14. That rule provides that a "defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." FED.R.CIV.PROC. 14(a)(1). "Thus, a third-party claim may be asserted only when the third party's liability is in some way dependant on the outcome of the main

24

1    claim and the third party's liability is secondary or derivative." *United States v. One 1977 Mercedes*

2    *Benz*, 708 F.2d 444, 452 (9th Cir. 1983).  As Wright and Miller explain, the claim

3         "cannot simply be an independent or related claim but must be based upon plaintiff's

4         claim against defendant.  The crucial characteristic of a Rule 14 claim is that defendant

5         is attempting to transfer to the third-party defendant the liability asserted against him by

6         the original plaintiff.  The mere fact that the alleged third-party claim arises from the

7         same transaction or set of facts as the original claim is not enough."  6 C. Wright & A.

8         Miller, FEDERAL PRACTICE AND PROCEDURE § 1446, at 257 (1971).

9         Here, the "third-party complaint fail[s] to show the requisite derivative or secondary liability on

10   the part of third-party defendants. . . . [T]he basic facts underlying [Aliya's] complaint and the basic

11   facts underlying the third-party complaint [are] disparate, and . . . each pleading describe[s] transactions

12   connected solely by the fact that the same [underlying agreements are at issue]." *Stewart v. Am. Int'l*

13   *Oil & Gas Co.*, 845 F.2d 196, 200 (9th Cir. 1988).  CTB, therefore, cannot file a third party complaint

14   against the third party defendants.  Had it wanted to assert these claims, it should have filed a

15   counterclaim and added the third party defendants as counter-defendants under Rule 20.

16        CTB disputes this.  It argues that it filed "its counterclaim and third-party complaint as a single

17   document" on March 23, 2015, and that the court struck the pleadings and directed it to file the

18   counterclaim and third party complaint as separate documents.[131]  This argument merely underscores

19   CTB's apparent misapprehension concerning the interaction of Rules 13 and 14.  CTB is correct that

20   its pleading, which purported to be both a counterclaim and third party complaint, was stricken; that is

21   because counterclaims are not the same as third party complaints, and must be filed separately.  CTB

22   incorrectly labeled what should simply have been a counterclaim against Aliya *and* the "third party

23   defendants" as a counterclaim *and* a third party complaint.  The clerk simply took CTB at its word, and

24   struck the combined counterclaim/purported third party complaint because those two types of pleading

25   are distinct and must be filed separately.

26        The court, however, will address the claims pled in the third party complaint on the merits

27

28

_____

[131]Order Striking Counterclaim and Third Party Complaint, Docket No. 77 (Mar. 25, 2015).

1    because it will permit CTB to include any viable claims against the third party defendants in an amended

2    counterclaim.   As will be discussed *infra*, the court dismisses substantive aspects of both the

3    counterclaim and the third party complaint with leave to amend; if it elects to amend, CTB must file *a*

4    *single* amended counterclaim against Aliya and the third party defendants (who will then be counter-

5    defendants), incorporating the claims asserted in the third party complaint in the counterclaim.

6           **D.      Whether All Claims Against Upton Park and Alvarado Must Be Dismissed**

7           Upton Park and Alvarado assert that all claims against them should be dismissed because  there

8    are no facts linking them to any of the allegedly unlawful activity pled in the third party complaint.

9    They assert that the third party complaint discusses the acts of "defendants" without differentiation, and

10   that dismissal is therefore warranted under Rule 8, *Twombly*, and *Iqbal*.  See *Lewis v. County of San*

11   *Diego*, No. 13 CV 2818 L JMA, 2014 WL 3527719, *6 (S.D. Cal. July 15, 2014) ("Plaintiffs

12   vaguely lump all defendants together without providing any factual allegations that specify separate acts

13   of O'Malley and Cline that would subject them to liability"); *Anthony v. Harmon*, No. CIV 09 2272

14   WBSKJM, 2009 WL 4282027, *2 (E.D. Cal. Nov. 25, 2009) ("A number of averments in plaintiffs'

15   complaint certainly appear to have been made without *Iqbal* in mind.   For example, plaintiffs'

16   allegations repeatedly lump defendants together, referring to them as 'Advisors,' and do not plead facts

17   that plausibly suggest that each defendant is liable for the claims in the Complaint").

18          CTB counters that it has alleged facts linking Upton Park and Alvarado to the claims in the third

19   party complaint.  The court agrees that the allegations concerning Upton Park make clear the nature of

20   its purported misconduct. The third party complaint alleges that the other third party defendants and

21   "Upton [Park] . . . created an intentionally misleading and confusing e-mail domain name,

22   'ctbcollect.com,' which Aliya's and Upton's employees have been using to conduct business and carry

23   out this unlawful scheme."[132]  It is unclear what additional information would be necessary to plead

24   clearly the nature of Upton Park's involvement in the purportedly wrongful acts, and Upton Park does

25   not specify why additional allegations are required.  Its motion to dismiss on this basis is therefore

26

27   _____

28          [132]TPC, ¶ 37.

1    denied.[133]

2        The court reaches a different conclusion with respect to Alvarado.  The only allegation that links

3    Alvarado to Aliya or another third party defendant is its assertion that he "is an agent, representative,

4    and/or employee of Aliya."[134]  CTB appears to contend that this allegation, coupled with its assertion

5    that Aliya and the third party defendants "are individuals and business entities who, upon information

6    and belief, are conspiring and acting in concert and active participation with each other and with Aliya

7    [ ]in committing the wrongful acts alleged [in the third party complaint] and in CTB's counterclaim,"[135]

8    is sufficient.  The assertion that Aliya and the third party defendants were "conspiring" or "acting in

9    concert" is a legal conclusion, and does not suffice to plead a plausible claim under *Iqbal* and *Twombly*.

10   See *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 937 (9th Cir. 2012) ("The conclusory conspiracy allegations

11   in the original complaint do not define the scope of any conspiracy involving Thomas, what role he had,

12   or when or how the conspiracy operated. They are insufficient to implicate Thomas"); *Woodrum v.*

13   *Woodward County, Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989) ("allegations of  conspiracy must be

14

---

15   [133]The third party complaint also alleges that Upton Park "is a fictitious alter ego of Nord."

16   (TPC, ¶ 8.) This does not suffice.  "There is no litmus test to determine when the corporate veil will be

17   pierced; rather the result will depend on the circumstances of each particular case.  There are,
     nevertheless, two general requirements: (1) that there be such unity of interest and ownership that the

18   separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are
     treated as those of the corporation alone, an inequitable result will follow." *Mesler v. Bragg Mgmt. Co.*,

19   39 Cal.3d 290, 300 (1985); *Automotriz Del Golfo De California S. A. De C. V. v. Resnick*, 47 Cal.2d

20   792, 796 (1957). "Conclusory allegations of 'alter ego' status are insufficient." *Neilson v. Union Bank*
     *of California, N.A.*, 290 F.Supp.2d 1101, 1116 (C.D. Cal. 2003).  CTB's "purely conclusory allegations

21   cannot suffice to state a claim based on [ ] alter-ego liability, even under the liberal notice pleading
     standard."  *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d 385, 426 (S.D.N.Y.

22   2003); see also *j2 Global, Inc. v. Fax87.Com*, No. CV 13-05353 DDP (AJWx), 2014 WL 462832, *4

23   (C.D. Cal. Feb. 5, 2014) ("Here, j2 has alleged no relevant facts in support of its alter ego theory.
      Indeed, although the Complaint asserts that Fani and MJF are alter egos, the only supporting factual

24   allegations are that 'Defendant Farjad Fani is the sole officer of Matt Johnson Finance, Inc. and purports
     to be the founder of Fax87.com.'  These allegations are insufficient to plausibly support a finding that

25   MJF and Fani are alter egos.  Nor do they suggest that there is as-yet-undiscovered evidence that would
     support such a finding").  CTB's assertion that Upton Park is Nord's alter ego is therefore an insufficient

26   basis upon which to ground liability.

27       [134]TPC, ¶ 9.

28       [135]*Id.*, ¶ 12.

                                    27

supported by material facts, not merely conclusory statements"); *Santos v. Countrywide Home Loans*, No. CV 09-02642-WBS-DAD, 2009 WL 3756337, *4 (E.D. Cal. Nov. 6, 2009) ("Second, plaintiff's allegations of a civil conspiracy are conclusory and inadequate. Plaintiff simply alleges that defendants acted 'in concert in defrauding plaintiff' without pleading any facts to support this claim. Asserting the bare legal conclusion that defendants acted in a conspiratorial fashion, without pleading further facts 'stops short of the line between possibility and plausibility.' There is nothing in the complaint to indicate that defendants were doing anything other than simply asserting their legal rights under the Note and Deed of Trust. Accordingly, plaintiff's seventh cause of action for civil conspiracy will be dismissed"). For this reason, CTB fails plausibly to allege claims against Alvarado, and those claims must be dismissed.

**E.     Whether CTB's State Law Unfair Competition and Trademark Infringement Claims and Lanham Act Section 43(a) Claim Must Be Dismissed**

Section 43(a) of the Lanham Act provides in pertinent part:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1).

"To establish a claim for either trademark infringement or false designation of origin, . . . a plaintiff must prove that the defendant (1) used in commerce (2) any word, false designation of origin,

false or misleading description, or representation of fact, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question." *Luxul Tech. Inc. v. Nectarlux, LLC*, __ F.Supp.3d __, 2015 WL 352048, *6 (N.D. Cal. Jan. 26, 2015) (citing *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007); *Int'l Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir. 1980)); see also *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 n. 6 (9th Cir. 1999) (noting that § 1125(a)(1) "embodie[s]" "[t]he same standard" as § 1114(1)).

"[F]ederal and state laws regarding trademarks and related claims of unfair competition are substantially congruent." *Lindeburg & Co.*, 633 F.2d at 916; see *Jada Toys, Inc. v. Mattel, Inc*., 518 F.3d 628, 632 (9th Cir. 2008) (holding that "[a]ll of Mattel's infringement claims [(including, *inter alia,* false designation of origin and common law unfair competition)] [we]re subject to the same test"); *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, __ F.Supp.3d __, 2014 WL 5507669, *9 (N.D. Cal. Oct. 1, 2014) ("The Ninth Circuit 'has consistently held that state common law claims of unfair competition . . . are 'substantially congruent' to claims made under the Lanham Act,'" citing *Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir.1994)). This is because "the courts have uniformly held that common law and statutory trademark infringement are merely specific aspects of unfair competition." See *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979). "Under the Lanham Act, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Hokto Kinoko Co. v. Concord Farms, Inc*., 810 F.Supp.2d 1013, 1031 32 (C.D. Cal. 2011) (citing *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1968)), aff'd, 738 F.3d 1085 (9th Cir. 2013). The same is true under California law. See *Academy of Motion Picture Arts & Sciences v. Benson*, 15 Cal.2d 685, 692 (1940) (common law unfair competition protects "a similarity which would be likely to deceive or mislead an ordinary unsuspecting customer" because such "is obnoxious to the law"); see also *Solid 21, Inc. v. Hublot of Am.*, No. CV 11-00468 DMG (JCx), 2015 WL 3756490, *7 (C.D. Cal. June 12, 2015) (addressing Lanham Act and state trademark and unfair competition claims together); cf. CAL. BUS. & PROF. CODE § 14245(a)(1) ("A person who does any of the following shall be subject to a civil action by the owner of the registered mark . . . : (1) Uses, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter in

connection with the sale, distribution, offering for sale, or advertising of goods or services on or in connection with which the use is likely to cause confusion or mistake, or to deceive as to the source of origin of the goods or services"); *Century 21 Real Estate, LLC v. Ramron Enterprises*, No. 14 CV 00788 AWI, 2015 WL 521350, *7 (E.D. Cal. Feb. 9, 2015) ("claims for trademark infringement and unfair competition under California law are 'subject to the same legal standards' as Lanham Act claims," quoting *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012)). For these reasons, the parties contend the state and federal trademark and unfair competition claims rise or fall together.[136] Although the court agrees that the pleadings requirements for the claims are the same, it addresses them separately because the state law claims fail for independent reasons.

### 1.    False Designation of Origin Under the Lanham Act

CTB alleges that its marks are "distinctive to [its] medical billing services and[ that,] over the years, [they] have acquired a strong secondary meaning." It contends that "[m]embers of the workers' compensation community – including but not limited to physicians, pharmacists, laboratory professionals, insurance companies, and professionals in the workers' compensation appeals process – recognize the [m]arks as distinguishing CTB's services from those of other companies."[137] CTB asserts that Aliya and the third party defendants have sought "to impersonate [it]" so as "to dupe insurance companies, the WCAB, and other third parties" and cause them to believe that they are in fact CTB.[138] It contends, for example, that "[Aliya and Aliya International] agents are sending and receiving e-mail communications at e-mail addresses using the 'ctbcollect.com' domain name to confuse or trick recipients and senders into believing that those individuals are interacting with CTB when, in fact, they are interacting with Aliya and [the third party defendants]."[139] They do this purportedly to "exploit the

---

[136]Motion at 8 ("In the Ninth Circuit, trademark claims and unfair competition claims under California state law are 'substantially congruent' with federal trademark and unfair competition claims. . . . As a result, the Court should dismiss these claims as well."); Opposition at 6 ("State law unfair competition and trademark infringement claims are 'substantially congruent' to false designation of origin claims brought under Section 43(a). . . . Thus, the same analysis applies to all three claims").

[137]Counterclaim, ¶ 12; TPC, ¶ 19.

[138]Counterclaim, ¶¶ 28-29; TPC, ¶¶ 35-36.

[139]Counterclaim, ¶ 31; TPC, ¶ 38.

1   commercial advantages of CTB's trademark, service mark, and trade name, gain a competitive

2   advantage over CTB[,] . . . usurp its revenues and business opportunities, and sully CTB's business

3   reputation."[140]  CTB asserts that Aliya and third party defendants are using its marks "without [its]

4   authorization or consent in a manner that is likely to cause confusion among consumers [and] unfairly

5   competing with CTB by . . . caus[ing] confusion as to the origin or quality of CTB's services."[141]

6        CTB contends that these allegations suffice to plead claims for false designation of origin as well

7   as common law unfair competition and state law trademark infringement.  The court agrees that the

8   allegations state a false designation of origin claim.  CTB pleads that Aliya and Aliya International have

9   "used in commerce" a name that is confusingly similar to its name, and is thus a "word, false designation

10  of origin, false or misleading description, or representation of fact, which . . . is likely to cause confusion

11  or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in

12  question." *Luxul Tech. Inc.*, 2015 WL 352048 at *6.  This suffices to state a claim under § 43(a).

13       Aliya and third party defendants assert that the claims are deficient because CTB must allege

14  that they "offer[ ] competing services to the public," *Wash. State Republican Party v. Wash. State*

15  *Grange*, 676 F.3d 784, 795 (9th Cir. 2012), and it has failed plausibly to do so.[142]  They note that CTB

16  alleges it is a medical billing company, and pleads that they are factoring companies.  While accurate,

17  this argument overlooks the fact that CTB alleges that Aliya and Aliya International are impersonating

18  *it* in order to "trick the WCAB, insurance companies, federal postal officials, and other persons and

19  entities," and "enable Aliya to intercept checks or payments payable to CTB."[143]  At this stage of the

20  proceedings, the court must accept these allegations as true.  Because it asserts that Aliya and the third

21  party defendants have allegedly used confusingly similar trade names or trademarks to "intercept checks

22  or payments payable to CTB," i.e., to provide the very same service CTB provides, CTB has plausibly

23  alleged that Aliya and the third party defendants have "offer[ed] competing services to the public."  See

24

25       [140]Counterclaim, ¶ 37; TPC, ¶ 44.

26       [141]Counterclaim, ¶ 47; TPC, ¶ 48.

27       [142]Motion at 4-5.

28       [143]Counterclaim, ¶ 28; TPC, ¶ 35.

*id.* See also *Stanislaus Custodial Deputy Sheriffs' Ass'n v. Deputy Sheriff's Ass'n of Stanislaus County*, No. CV F 09–1988 LJO SMS, 2010 WL 2218813, *9 (E.D. Cal. June 1, 2010) ("Plaintiff alleges the defendants provide competing bargaining units and provide competing charitable and civic services. Plaintiff alleges its name has good will within the community and is associated in the mind of the public with its services. Thus, plaintiff has alleged a 'competitive context' of the use of its name. It has alleged that defendant has competed with it and reaped a commercial benefit from the use of the name"); *Grooms v. Legge*, No. 09CV489 IEG POR, 2009 WL 962067, *4 (S.D. Cal. Apr. 8, 2009) (granting a preliminary injunction on a Lanham Act false designation of origin claim where plaintiffs and defendants were initially in a business venture that fractured, and defendants proceeded to use a similar mark in connection with a business provided similar services). Aliya's and third party defendants' assertion that they do not compete with CTB because Aliya is a factoring company while they are medical billing companies is therefore unavailing. Effectively, the third party defendants allege that, however they describe their primary business, they and Aliya are competing in the collection of receivables. See, e.g., *International Foundation of Employee Ben. Plans, Inc. v. Cottrell*, Civil No. WDQ–14–1269, 2015 WL 127839, *2-3 (D. Md. Jan. 7, 2015) ("Although the U.S. Supreme Court recently held that noncompetitors may bring a false advertising claim, it did not address false designation. . . . Although Static Control sued under the Lanham Act's false advertising provision, the Supreme Court broadly framed the standing issue as whether 'the cause of action in § 1125(a) extend[s] to plaintiffs like Static Control?,' and noted that '[t]he statute authorizes suit by "any person."' . . . [T]he Supreme Court limited § 1125(a)(1) standing to plaintiffs 'alleg[ing] an injury to a commercial interest in reputation or sales.' In reaching its conclusion, the Supreme Court relied on the Lanham Act's purpose, . . . which is replete with references to 'commerce.' Because the Act's purpose applies to all its provisions, there is no reason to think the Supreme Court would apply different standing requirements to a false designation claim. In fact, that Court observed that "[m]ost of the enumerated purposes are relevant to false-association cases," . . . which, like false designation, would be brought under § 1125(a)(1)(A). In light of *Lexmark Int'l, Inc.*, the Court concludes that direct competition is not a prerequisite to bringing a false designation claim under 15 U.S.C. § 1125(a)(1)(A). Accordingly, Cottrell is not entitled to dismissal on the ground that she and IFEBP are not direct competitors," citing

1   and quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014)).

2   Aliya and the third party defendants also contend CTB consented that they could use its name

3   or confusingly similar names.[144] They cite the "Attorney-in-Fact" provisions of the agreements, which

4   permit Aliya to take any "collection efforts in [CTB's] name that [Aliya] deems necessary or

5   desirable."[145]  CTB contends that these provisions are not enforceable.  First, it asserts the provision is

6   unenforceable because Aliya "unilaterally and unlawfully terminated" its "entire business relationship

7   with CTB" on November 5, 2014.[146]  Under California law, "[w]hen a party's failure to perform a

8   contractual obligation constitutes a material breach of the contract, the other party may be discharged

9   from its duty to perform under the contract." *Brown v. Grimes*, 192 Cal.App.4th 265, 277 (2011); see

10  also *De Burgh v. De Burgh*, 39 Cal.2d 858, 863 (1952) ("in contract law a material breach excused

11  further performance by [an] innocent party"); *Sanchez v. County of San Bernardino*, 176 Cal.App.4th

12  516, 529-30 (2009) ("A reasonable jury could conclude that the County's breach of the confidentiality

13  provision excused any further performance by Sanchez").

14  "Normally the question of whether a breach of an obligation is a material breach, so as to excuse

15  performance by the other party, is a question of fact." *Brown*, 192 Cal.App.4th at 277; *Whitney Inv. Co.

16  v. Westview Dev. Co.*, 273 Cal.App.2d 594, 601 (1969) ("Whether a breach is so material as to constitute

17  cause for the injured party to terminate a contract is ordinarily a question for the trier of fact").  Whether

18  a partial breach is material depends on "the importance or seriousness thereof and the probability of the

19  injured party getting substantial performance." *Brown*, 192 Cal.App.4th at 278 (citing 1 B. Witkin,

20  SUMMARY OF CALIFORNIA LAW (10th ed. 2005) Contracts, § 852, pp. 938-40; *Superior Motels, Inc. v.

21  Rinn Motor Hotels, Inc*., 195 Cal.App.3d 1032, 1051 (1987); *Sackett v. Spindler*, 248 Cal.App.2d 220,

22  229 (1967) (setting forth various factors used by the Restatement of Contracts to judge materiality).

23  CTB alleges facts that, accepted as true, adequately plead a material breach of the agreements

24

25

26  [144]Motion at 7.

27  [145]Aliya's RJN, Exh. A ("First Agreement"), ¶ 17, Exh. B ("Second Agreement"), ¶ 21, Exh. C
    ("Third Agreement"), ¶ 24.

28  [146]Counterclaim, ¶¶ 23, 27-37; TPC, ¶¶ 30, 34-44.

1   by Aliya that relieves it of its obligations under the agreements.[147] In addition, the plain language of the

2   attorney-in-fact provision permits Aliya (and only Aliya) to "make collection efforts in [*CTB's*] name";

3   it does not permit Aliya (or any other entity) to hold itself out as a distinct entity with a confusingly

4   similar name.  Thus, the provision is inapposite for this reason as well.  Aliya and the third party

5   defendants' consent argument is therefore unavailing.

6       Consequently, the court denies Aliya's and third party defendants' motions to dismiss CTB's

7   false designation of origin claim.

8                          **2.      State Law Unfair Competition and Trademark Infringement**

9       Aliya and third party defendants next argue, and the court agrees, that to the extent CTB's

10  trademark and unfair competition claims are based on state law, they fail because the agreements are

11  governed by Nevada law.  A federal court sitting in diversity applies the choice-of-law rules of the state

12  in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 494–96 (1941). Thus,"[i]n

13  determining the enforceability of a choice of law provision in a diversity action, a federal court applies

14  the choice of law rules of the forum state, in this case California."  *Hatfield v. Halifax PLC,* 564 F.3d

15  1177, 1182 (9th Cir. 2009).

16      The choice of law provision in each agreement states: "All questions concerning the

17  performance, construction, validity and interpretation of [the agreement] shall be governed by the laws

18  of the State of Nevada."[148]  "[A] valid choice-of-law clause, which provides that a specified body of law

19  'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related

20

21      [147]Even if Aliya did not materially breach the contract by terminating it, moreover, the attorney-
22  in-fact provision states that it is irrevocable until "all [l]iens purchased by [Aliya] and all other amounts
    which may be owed by [CTB] to [Aliya] have been paid in full."  (See First Agreement, ¶ 17;Second
23  Agreement, ¶ 21; Third Agreement, ¶ 24.)  Neither the counterclaim nor the third party complaint
    alleges that CTB owes Aliya any sum of money; to the contrary, CTB contends that Aliya's conduct
24  damaged CTB and it is entitled to recover damages as a result.  (Counterclaim, ¶¶ 42-43 ("Aliya
    Medcare's wrongful and premature termination of the Third Agreement caused injury to CTB by, among
25  other things, precluding CTB from collecting the revenues and profits that it would have obtained or
    received had Aliya Medcare performed the Third Agreement as promised.  [¶] Accordingly, CTB is
26  entitled to recover damages for breach of contract in an amount to be shown according to proof at trial.")
    Based on the allegations of the third party complaint, therefore, the attorney-in-fact provisions did not
27  survive Aliya's termination of the agreements.

28      [148]First Agreement, ¶ 27; Second Agreement, ¶ 30; Third Agreement, ¶ 33.

34

to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 470 (1992). False designation of origin and its state law counterparts are commercial torts. See *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 720 (9th Cir. 2004) ("trademark infringement generally sounds in tort"); *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998) (noting that trademark infringement is "akin to a tort case"); see also *Lindeburg & Co.*, 633 F.2d at 915 ("The Lanham Act created a federal protection against two types of unfair competition, infringement of registered trademarks and the related tort of false designation of the origin of goods"). Aliya's and the third party defendants' alleged efforts to collect receivables, including their allegedly tortious acts of impersonating CTB to do so, are conduct related to the agreements; but for the existence of the agreements, they would have had no claim to the receivables at all. Under *Nedlloyd*, therefore, the claims are governed by Nevada law. See *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 889 F.Supp.2d 1198, 1216-17 (E.D. Cal. 2012) (claims for state law trademark infringement were governed by New Jersey choice of law provision under California's choice of law rules), aff'd, 600 Fed. Appx. 502, 504 (9th Cir. Jan 15, 2015) (Unpub. Disp.) ("The district court did not err in finding the New Jersey choice-of-law provisions in the franchise agreements enforceable. Century 21 has its principal place of business and headquarters in New Jersey").

*Villelli v. R.A.V., Inc.*, No. G046045, 2012 WL 6721117, *7 (Cal. App. Dec. 28, 2012) (Unpub. Disp.), the only authority cited by CTB, is inapposite. There, the Court of Appeal explained that a choice of law provision in a trust did not control because the "action [sought] relief from third parties who allegedly coerced and fraudulently induced a cotrustee to transfer [t]rust property for inadequate consideration." *Id*. The claims for relief thus did not arise out of or relate to the trust agreement, but rather turned "on the propriety of the third parties' conduct." The court held that the trust's "choice-of-law provision . . . [did] not apply under th[o]se circumstances." *Id*. Where the causes of action are *related to* the underlying agreement, however, the choice of law provision applies under *Nedlloyd* if the plaintiff is a party to the contract. See *Vitek v. Bank of Am., N.A.*, No. 13-CV-0816 JLS (ANx), 2014 WL 1042397, *6 n. 4 (C.D. Cal. Jan. 23, 2014) ("Plaintiff argues that the choice of law provision should not apply to its California UCL claim against Insurance Defendants, as they are not

1  parties to the contract. However, the choice of law provision 'encompasses *all* causes of action arising

2  from *or related to* that agreement, regardless of how they are characterized,' and Plaintiff is a party to

3  the contract and its claims against Insurance Defendants stem from that agreement for the reasons stated

4  above").

5       Under *Nedlloyd*, the court then must determine: "(1) whether the chosen state has a substantial

6  relationship to the parties or their transaction or (2) whether there is any other reasonable basis for the

7  parties' choice of law.  If neither of these tests is met, that is the end of the inquiry, and the court need

8  not enforce the parties' choice of law.  If, however, either test is met, the court must next determine

9  whether the chosen state's law is contrary to a fundamental policy of California."  3 Cal.4th at 466.

10      Neither party addresses this aspect of the choice of law analysis.  There can be no question,

11 however, that Nevada has "a substantial relationship to the *contracting parties* and to their transactions."

12 *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 537 (C.D. Cal. 2013).  First, Aliya is

13 incorporated in Nevada.  See *Nedlloyd*, 3 Cal.4th at 467 ("A party's incorporation in a state is a contact

14 sufficient to allow the parties to choose that state's law to govern their contract").  Individual defendants

15 Nord and Sten are allegedly agents or employees of Aliya, and the remaining third party defendants are

16 purportedly acting in concert with it and each other.[149]  In sum, the action bears a substantial relationship

17 to Nevada, which justifies the application of Nevada law absent a showing that that law is contrary to

18 a fundamental policy of California.

19      "Thus, the [c]ourt will enforce the choice-of-law provision unless [CTB] can show that both (1)

20 'the chosen law is contrary to a fundamental policy of California' *and* (2) 'that California has a

21 materially greater interest in the determination of the particular issue.'"  *Gustafson*, 294 F.R.D. at 537

22 (citing *Washington Mut. Bank v. Superior Court*, 24 Cal.4th 906, 917 (2001)).  The burden is on CTB,

23 as the party resisting enforcement of the choice of law provision, to make this showing.  See *Washington*

24 *Mut. Bank*, 24 Cal.4th at 917 ("if the proponent of the clause [(here Aliya and third party defendants)]

25 demonstrates that the chosen state has a substantial relationship to the parties or their transaction or that

26 a reasonable basis otherwise exists for the choice of law, the parties' choice generally will be enforced

27

28

---

[149]TPC, ¶¶ 4-5, 12.

36

1   unless the other side [(here CTB)] can establish both that the chosen law is contrary to a fundamental

2   policy of California and that California has a materially greater interest in the determination of the

3   particular issue"). "[CTB], however, ha[s] failed to make any showing that the law[ ] designated in the[

4   ] choice-of-law provision[ is] contrary to a fundamental policy of California." *Id.* See also *Faili v. BAC*

5   *Home Loans Servicing LP*, No. 13 CV 1105 JLS (ANx), 2014 WL 255704, *11 (C.D. Cal. Jan. 23,

6   2014) ("Plaintiffs have not met their burden of demonstrating that the chosen states' laws are contrary

7   to a fundamental policy of California, and accordingly the Court does not address whether California

8   has a materially greater interest in the determination of the issues raised by Plaintiffs"). The choice of

9   law provision is therefore enforceable. Because Nevada law – rather than California law – applies,

10  CTB's California state law unfair competition and trademark infringement claims must be dismissed.

11  If CTB wishes to replead these claims, it must do so under Nevada law.

12          **F.      Whether CTB's UCL Claim Must Be Dismissed**

13          "The UCL prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair,

14  deceptive, untrue or misleading advertising.'" *Stearns v. Select Comfort Retail Corp*., No. 08-2746

15  JF (PVT), 2010 WL 2898284, *16 (N.D. Cal. July 21, 2010) (quoting Cal. Bus. & Prof. Code §

16  17200). "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful,

17  unfair, or fraudulent.'" *Id.* (quoting *Berryman v. Merit Prop. Mgmt., Inc*., 152 Cal.App.4th 1544,

18  1554 (2007)). The law is "sweeping, embracing anything that can properly be called a business

19  practice and [that is] at the same time . . . forbidden by law." *Cel-Tech Communications, Inc. v. L.A.*

20  *Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); see also *Palestini v. Homecomings Fin., LLC*, No.

21  10CV1049-MMA, 2010 WL 3339459, *9 (S.D. Cal. Aug. 23, 2010) (same). California courts have

22  held that "an action under the UCL is not an all-purpose substitute for a tort or contract action."

23  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1150 (2003) (citations and internal

24  quotation marks omitted).

25          CTB contends that Aliya and the third party defendants "ha[ve] engaged in unlawful, unfair, and

26  fraudulent business acts and practices by performing the unlawful conduct alleged herein, including but

27  not limited to infringing the [m]arks, impersonating CTB, intentionally settling receivables for pennies

28

on the dollar, and misappropriating and misusing CTB's tax identification number."[150]  Like the state law unfair competition claims, these allegations, and therefore the UCL claim itself, are "related to" the underlying agreements between CTB and Aliya; the choice of law provision in the agreements therefore controls.  See *Nedlloyd*, 3 Cal.4th at 470.  This is so notwithstanding the fact that the third party defendants were not signatories to that contract.  See *Washington Mut. Bank*, 24 Cal.4th at 916 ("[w]hen a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction"); *Vitek*, 2014 WL 1042397 at *6 n. 4 ("[T]he choice of law provision 'encompasses *all* causes of action arising from *or related to* that agreement, regardless of how they are characterized,' and Plaintiff is a party to the contract and its claims against Insurance Defendants stem from that agreement for the reasons stated above").  Because the agreements indicate that Nevada law applies, CTB cannot allege a UCL claim.  See *Century 21*, 889 F.Supp.2d at 1235 ("The court has found, however, that New Jersey law is applicable in this action and the parties have not suggested that New Jersey has an analogous UCL claim.  Accordingly, the court will grant Century 21's motion for summary adjudication with respect to All Professional's UCL claim"), aff'd, 600 Fed. Appx. 502 (9th Cir. Jan. 15, 2015) (Unpub. Disp.); *Gustafson*, 294 F.R.D. at 537 ("Thus, the Court finds that the choice-of-law provisions contained in putative class members contracts are enforceable and would bar a claim under the UCL"); *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F.Supp.2d 1059, 1070 (E.D. Cal. 2006) ("A valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL"); *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F.Supp.2d 842, 861-62 (N. D. Cal. 2000) (dismissing a UCL claim on the basis that claim fell within scope of a New Jersey choice-of-law clause providing that "the construction, interpretation and performance of this Agreement shall be governed by the local laws of the State of New Jersey").  This claim therefore must be dismissed.

**G.    Whether CTB's Breach of Fiduciary Duty Claim Must Be Dismissed**

The parties agree that, consistent with the court's choice of law analysis, this claim is governed

---

[150]Counterclaim, ¶ 78; TPC, ¶ 79.

by Nevada law.  "A claim for breach of fiduciary duty under Nevada law requires a plaintiff to demonstrate a fiduciary duty exists, that duty was breached, and the breach proximately caused the damages."  *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F.Supp.2d 1013, 1024 (D. Nev. 2009) (quoting *Brown v. Kinross Gold U.S.A., Inc.*, 531 F.Supp.2d 1234, 1245 (D. Nev. 2008)).  "'[A] fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith.'"  *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880-81 (9th Cir. 2007) (quoting *Hoopes v. Hammargren,* 102 Nev. 425, 431 (1986)); *Powers v. United Services Auto. Ass'n*, 115 Nev. 38, 42 (1999) ("A fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another").

"Ordinarily, an arms-length contractual relationship will not support a finding of a fiduciary or confidential relationship."  *Butcher v. Advanced Mineral Technologies, Inc.*, No. 2:CV 10-01802 PMP, 2011 WL 810256, *6 (D. Nev. Mar. 2, 2011) (citing *Executive Mgmt., Ltd. v. Ticor Title Ins. Co.,* 114 Nev. 823, 841 (1998) ("a fiduciary relationship does not exist between a buyer and seller in an arms length transaction" (citation omitted)).  CTB contends that this is not an ordinary case, however.  It asserts that, to the extent it is applicable, the attorney-in-fact provision in the agreements, pursuant to which Aliya and the third party defendants have purportedly been acting,[151] imposes fiduciary duties on them.[152]

CTB cites *LeMon v. Landers*, 81 Nev. 329, 331 (1965), for the proposition that, standing alone,

---

[151]Rule 8(d)(2) of the Federal Rules of Civil Procedure allows a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." FED.R.CIV.PROC. 8(d)(2).  If a party alleges alternative theories, "the pleading is sufficient if any one of them is sufficient."  *Id.*  See also *Anheuser-Busch Companies, LLC v. Clark*, No. 13-CV-00415 GEB, 2013 WL 3788426, *2 (E.D. Cal. July 18, 2013) ("Rule 8(d)(2) authorizes '[a] party [to] state as many separate claims . . . as it has, regardless of consistency'").  "However, pursuit of alternate relief does not relieve plaintiffs of their obligation to plead sufficient factual allegations in support of that request." *Milo & Gabby, LLC v. Amazon.com, Inc.*, 12 F.Supp.3d 1341, 1353-54 (W.D. Wash. 2014) (citing *Garcia v. M–F Athletic Co.*, No. CV 11–2430, 2012 WL 531008, *2 (E.D. Cal. Feb. 17, 2012) (noting that plaintiffs are allowed to plead in the alternative, but finding, on a motion to dismiss, that plaintiff must allege facts that "plausibly suggest an entitlement to relief")). The question, therefore, is whether, assuming the attorney-in-fact provision continues to be effective, it imposes a fiduciary obligation.

[152]Counterclaim, ¶ 71-72; TPC, ¶ 72-73.

a power-of-attorney is sufficient to create a fiduciary relationship between the parties.  In *LeMon*, appellant owned a parcel of land that he developed prior to meeting respondent.  *Id*. at 330.  The two later "entered into a connubial relationship" with one another.  *Id*.  Thereafter, appellant moved to Mexico, and respondent convinced him to sign a power-of-attorney naming respondent as his attorney-in-fact for the express purpose of transferring the property to a corporation; this was purportedly done to keep the property from falling into the hands of appellant's current and former wives.  *Id*. at 331.  Instead, respondent transferred the property by deed to her uncle, who immediately deeded it back to her.  *Id*.  The Nevada Supreme Court stated that "[t]he determinative point at issue [wa]s whether or not the respondent breached her fiduciary relationship which was established by the power of attorney."  *Id*.  It found that she had, explaining that

> "[a]n agent, such as respondent in these circumstances, owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal.  The object of the agency is to ensure the transaction of the business of the principal to his best advantage.  An agent will not be permitted to pervert his authority to his own personal gain in severe hostility to the interests of his principal."

> *Id*. at 332.

The Nevada Supreme Court therefore treated the attorney-in-fact provision as creating a principal-agent relationship, which in turn imposed fiduciary obligations on respondent.  *Id.*  See also *Walch v. State*, 112 Nev. 25, 31  (1996) (noting that plaintiff's "role as a fiduciary toward Nell" arose by virtue of a "power of attorney").

Aliya and the third party defendants contend that *LeMon* is factually inapposite and does not control.  While the facts in *LeMon* are unique, the proposition that execution of a power-of-attorney gives rise to a fiduciary relationship under Nevada law is not.  Nevada law *defines* a fiduciary, *inter alia*, as "a personal representative, trustee, *agent acting under a power of attorney* or other person authorized to act as a fiduciary with respect to the property of another person."  NEV. REV. STAT. § 120.150 (emphasis added).  The attorney-in-fact provision in the agreements unquestionably allowed Aliya to act as CTB's agent, e.g., by permitting Aliya to use CTB's name, accept its mail, notify claimants on its behalf, etc.  Under Nevada law, therefore, CTB has plausibly alleged the existence of a fiduciary

relationship between it and Aliya.  The attorney-in-fact provision, however, binds only Aliya and CTB.  Based on the allegations in the third party complaint, the third party defendants were not CTB's agents.  Indeed, CTB contends they did not have authority to engage in the acts they performed.  See RESTATEMENT (THIRD) OF AGENCY § 3.01 (2006) ("Actual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf").  Consequently, the breach of fiduciary duty claim against them fails.

Moreover, even against Aliya, the claim fails.  CTB does not allege what fiduciary obligations Aliya or any of the third party defendants violated nor how they violated them.  The counterclaim and third party complaint merely allege that Aliya and the third party defendants "violated and breached their fiduciary duties to CTB by engaging in the wrongful conduct alleged herein."[153]  This lack of precision is problematic because CTB pleads the claim in the alternative.  If the agreements remain in effect and the attorney-in-fact provisions are operative, the receivables are Aliya's property, and it is not clear that the conduct alleged in the complaint violates the fiduciary duties set created by the power-of-attorney provisions.  Particularly for this reason, CTB's conclusory allegations are insufficient to support the breach element of its fiduciary duty claim.  *In re Charles Schwab Corp. Sec. Litig.*, No. CV 08 01510 WHA, 2009 WL 1371409, *7 (N.D. Cal. May 15, 2009) ("Conclusory allegations of a fiduciary duty and breach thereof do not suffice"); see also *Nalbandian v. Lockheed Martin Corp.*, No. 10 CV 1242 LHK, 2011 WL 338809, *4 (N.D. Cal. Feb. 1, 2011) ("Plaintiffs make no specific allegations as to what fiduciary obligations Defendants violated or how Defendants violated those obligations.  These conclusory allegations are insufficient to support Plaintiffs' breach of fiduciary duty claim").  The claim therefore must be dismissed.

### H. Whether CTB's Claim for an Accounting Against Third Party Defendants Must Be Dismissed

The third party defendants also move to dismiss CTB's claim for an accounting.  "An action for accounting . . . is a proceeding in equity for the purpose of obtaining a judicial settlement of the accounts

---

[153]Counterclaim, ¶ 73; TPC, ¶ 74.

of the parties in which proceeding the court will adjudicate the amount due, administer full relief and render complete justice." *Oracle USA, Inc. v. Rimini St., Inc.*, No. 2:10 CV 00106 LRH, 2010 WL 3257933, *6 (D. Nev. Aug. 13, 2010).  "An accounting cause of action is equitable in nature, and may be sought 'where . . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.'" *Id.*

A claim for an accounting may "be brought where there is a fiduciary or a trust relationship between the parties." *McCurdy v. Wells Fargo Bank, N.A.*, No. 10-CV-00880, 2010 WL 4102943, *3 (D. Nev. Oct. 18, 2010); *Simon v. Bank of Am., N.A.*, No. CV 10-00300 GMN LRL, 2010 WL 2609436, *11 (D. Nev. June 23, 2010).  As noted, CTB has not plausibly alleged that the third party defendants were in a fiduciary relationship with it.  Thus, its accounting claim against them cannot be sustained on that basis.

"Although courts typically grant an accounting where a fiduciary relationship exists between the parties, courts have extended the remedy of accounting to nonfiduciaries where 'dealings between the parties are so complex that an equitable master, and not a jury, is required to sort out the various dealings between the parties.'" *Oracle USA, Inc*, 2010 WL 3257933 at *6 (D. Nev. Aug. 13, 2010) (quoting *Leonard v. Optimal Payments Ltd. (In re Nat'l Audit Def. Network)*, 332 B.R. 896, 918-19 (Bankr. D. Nev. 2005)); see also *Rapaport v. Soffer*, No. 10 CV 935 MMD RJJ, 2012 WL 2522069, *7 (D. Nev. June 29, 2012) ("This action is available in order to obtain a judicial settlement of the accounts of the parties, particularly where the circumstances surrounding account transactions are in dispute").  District courts applying Nevada law typically decline to dismiss claims for an accounting where claims that would support an account are not dismissed.  See, e.g., *Oracle USA, Inc*, 2010 WL 3257933 at *6 ("Although the parties in this matter do not have a fiduciary relationship, the court shall not dismiss this claim at this time because the record before the court is insufficient for the court to determine the full relationship between the parties"); *Rapaport*, 2012 WL 2522069 at *7  ("Here, the Court will not dismiss the accounting claim while pending claims surrounding WDN survive dismissal").

In this case, there are no claims in the third party complaint that survive dismissal that would support an accounting.  This is because the court has concluded that only CTB's false designation of

1    origin claim survives dismissal.  Thus, the accounting claim against the third party defendants must also

2    be dismissed.  Aliya did not seek dismissal of the accounting claim against it, and the court expresses

3    no opinion concerning the viability of that claim.

4

5                                              **III.  CONCLUSION**

6            For the reasons stated, the court grants in part and denies in part Aliya's and the third party

7    defendants' motions to dismiss.  The court dismisses CTB's claims against Alvarado.  It also dismisses

8    CTB's state law unfair competition and trademark claims, UCL claim, and breach of fiduciary duty

9    claims against Aliya and the third party defendants.  Finally, the court dismisses CTB's accounting

10   claim against the third party defendants.  The court denies the motions to dismiss CTB's false

11   designation of origin claim.  Because Aliya did not move to dismiss CTB's breach of contract or

12   accounting claims those claims will also proceed.  Dismissal is with leave to amend.  See *In re Daou*

13   *Sys., Inc*., 411 F.3d 1006, 1013 (9th Cir. 2005) ("Dismissal without leave to amend is improper unless

14   it is clear . . . that the complaint could not be saved by any amendment"); *California ex rel. California*

15   *Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir. 2004)

16   ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*,

17   371 U.S. 178, 182 (1962)).  CTB, however, may only plead its state law trademark infringement and

18   unfair competition claims, and (to the extent Nevada law recognizes a comparable cause of action) its

19   UCL claim, under Nevada law.  CTB may file a single amended counterclaim against Aliya and the third

20   party defendants within twenty (20) days of the date of this order if it is able to remedy the deficiencies

21   the court has noted.

22           CTB may not plead new claims.  Should the scope of any amendment exceed the scope of leave

23   to amend granted by this order, the court will strike the offending portions of the pleading under Rule

24   12(f).  See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any

25   redundant, immaterial, impertinent, or scandalous matter.  The court may act: (1) on its own; or (2) on

26   motion made by a party either before responding to the pleading or, if a response is not allowed, within

27   21 days after being served with the pleading"); see also *Barker v. Avila*, No. 2:09-cv-0001-GEB-JFM,

28

2010 WL 31701067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims).

DATED: July 9, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE